UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALTON EARL INGRAM, Jr., MD, | |
| Plaintiff, | Case No. 3:17-cv-01565 |
| v. | Judge Eli J. Richardson |
| | Magistrate Judge Newbern |
| TENNESSEE DEPARTMENT OF HEALTH, et al., | |
| Defendants. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

The Tennessee Board of Medical Examiners suspended pro se Plaintiff Dr. Alton Earl Ingram, Jr.'s medical license in 2006 and denied his application to lift the suspension in November 2009. Ingram spent years trying to reinstate his license through administrative and state court proceedings and was finally successful on July 18, 2017. In this federal action, Ingram claims that two former Board members, Defendants Michael Zanolli and Subhi Ali; the Board's former medical director, Defendant Larry Arnold; and counsel for the Tennessee Department of Health, Andrea Huddleston, violated his civil rights in numerous ways during those proceedings. The defendants have filed a motion to dismiss. (Doc. No. 17.)

For the reasons that follow, the Magistrate Judge RECOMMENDS that the motion to dismiss be GRANTED. Ingram's claims for declaratory relief and state law claims should be DISMISSED for lack of jurisdiction, and Ingram's Section 1983 claims should be DISMISSED for failure to state a claim.

# I.      Factual and Procedural Background

## A.  Ingram's Allegations

The following facts are stated as Ingram pleaded them in his complaint, assumed to be true, and construed in his favor:

In October 2006, the Board suspended Ingram's Tennessee medical license after finding that an administrative law judge in Florida had suspended Ingram's medical license in that state. (Doc. No. 1.) The Board's order provided that, at the end of the three-year suspension, Ingram could move to reinstate his license by proving that "(1) he ha[d] obtained additional education or training in anesthesia for surgery and (2) he ha[d] maintained proficiency in the medical practice of plastic and reconstructive surgery." (*Id.* at PageID# 4.) The second condition raised a red flag for Ingram, who was concerned that complying with it would entail violating "Tennessee Rule 0880-2.12(d)(2)."[1] The rule states, in pertinent part,

> [i]t is the Board's intent that the licensee not practice medicine at all during the period of suspension. If a licensee practices medicine in another state during the period of any ordered suspension, the length of time of practice in another state shall not be counted toward fulfilling the suspension ordered by the Board.

(*Id.* (quoting Tenn. Comp. R. & Regs. 0880-02-.12).) Ingram voiced his concern to Alexa Whittemore, an attorney with the Tennessee Department of Health, who falsely told him that compliance with the order and the rule would not be a problem. (*Id.* at PageID# 4–5.) Ingram credited Whittemore's assurance and did not challenge the order. (*Id.* at PageID# 5.)

The Board's order left Ingram with an active but suspended license that would expire in June 2008. (*Id.*) Ingram sought to renew his license online before it expired but was unable to do

---

[1]      Although Ingram does not identify it as such, this appears to be a subsection of the Tennessee Board of Medical Examiners Rules and Regulations Governing the Practice of Medicine Rule 0880-2.12, which addresses licensure discipline and civil penalties.

so. (*Id.*) Ingram raised the issue to the Board's medical director, Dr. Larry Arnold, who falsely informed Ingram that it was the Board's "'longstanding practice' not to allow suspended licenses to be renewed." (*Id.*) Arnold also told Ingram that reinstatement of his license would be "a sure thing" if he actualized his reinstatement plan and wrongly informed Ingram that there was "no mechanism whereby the plan could be placed before the Board for prior approval . . . ." (*Id.* at PageID# 6.) Ingram relied on Arnold's statements and maintained proficiency in plastic surgery. (*Id.*)

In the fall of 2009, Ingram filed an application to reinstate his license. (*Id.*) The application contained about 100 pages of supporting documents. (*Id.*) Ingram communicated regularly with the Board's staff about the application, who reviewed the documents and assured him that he had complied with the relevant rules, that he had demonstrated compliance with the suspension order, and that the Board would receive all his documents at its next meeting. (*Id.*)

The Board considered Ingram's application at its November 2009 meeting, during which the Board's staff stated that they had not provided the Board with Ingram's supporting documents in order to "save trees." (*Id.* at PageID# 7.) Ingram asked the Board to postpone the hearing so that it would have time to review his full application, but the Board declined. (*Id.*) During the meeting, Board members Subhi Ali and Michael Zanolli violated its rules and "other statutory and procedural requirements" by attempting to add new terms to the 2006 suspension order, despite repeated warnings from the Board's counsel that the Board was violating Ingram's rights. (*Id.*) Ali exhibited bias against Ingram during the hearing and voted against lifting the suspension on Ingram's license; Zanolli voted in Ingram's favor. (*Id.* at PageID# 9, 11.) Ultimately, the Board denied Ingram's application and instructed him to work with Medical Director Arnold to develop a new plan for reinstatement of his license. (*Id.* at PageID# 7–8.)

Ingram attempted to do so. He spoke with Arnold at least ten times over the next six months. (*Id.* at PageID# 8.) In one conversation, Ingram stated that he intended to appeal the Board's decision, if that was possible. (*Id.*) Arnold falsely responded that it was not, explaining that the Board's most recent set of instructions superseded the decision that Ingram wanted to appeal. (*Id.*) Ingram believed Arnold and did not pursue an appeal. (*Id.*) Instead of helping Ingram develop a reinstatement plan, Arnold advised Ingram to petition the Board for guidance about how to proceed. (*Id.*)

Ingram heeded that advice and the Board heard his petition in the summer of 2010. (*Id.*) The Board refused to clarify its prior suspension order or otherwise indicate how Ingram could reinstate his license. In that meeting, Board Member Ali again exhibited bias towards Ingram, but did not recuse himself from the proceeding. (*Id.* at PageID# 9.) Eventually, Ali and Mitchell Mutter, another Board member, took over the meeting and told Ingram "that he would receive 'no relief' from the Board." (*Id.*)

Ingram filed an appeal in the Chancery Court of Davidson County, Tennessee. (*Id.*) In 2012, the chancery court found that Ingram's failure to timely appeal the Board's November 2009 denial of his application for reinstatement deprived it of subject-matter jurisdiction. (*Id.*) However, the court noted that Ingram had presented compelling evidence that the Board had violated Tennessee statutes and his right to due process and remanded to the Board "with strict instructions." (*Id.*)

Ingram's case quickly returned to the Chancery Court. After the initial remand, Ingram filed a request for a hearing before the Board. (*Id.*) The Board did not set a hearing, and Ingram again appealed. (*Id.*) Once served with Ingram's appeal, the Office of the Attorney General of

Tennessee contacted Ingram, who agreed to dismiss his appeal in exchange for an administrative-law-judge supervised hearing before the Board in the summer of 2012. (*Id.* at PageID# 9–10.)

The Board scheduled the hearing for March 2013 instead. (*Id.* at PageID# 10.) Attorney and Board employee Andrea Huddleston "repeatedly and falsely" told Ingram that it was impossible for the Board to convene a contested case panel to conduct the hearing by the summer of 2012. (*Id.*) When the Board eventually held the promised hearing, it was riddled with procedural violations and misconduct. (*Id.*) Arnold offered "perjured testimony," which Huddleston suborned. (*Id.*) Ali admitted that he was biased against Ingram, but instead of following Tennessee law requiring him "to make a statement for the record and to recuse himself from the proceedings," he "stayed in the hearing room, hand-picked [Zanolli] as his replacement in the hearing, and engaged in a lengthy discussion with [Zanolli] off the record during which [Ali] repeatedly gestured at [Ingram] . . . ." (*Id.* at PageID# 11.) Ingram believes that Ali made defamatory statements about Ingram to Zanolli during that discussion and that Zanolli turned against Ingram to "curry favor" with Ali, who held "a leadership position on the Board" that Zanolli wanted. (*Id.*) Overall, the hearing lacked the required procedural safeguards. (*Id.*) For example, one of the three panelists stated that he would not follow the applicable standard of proof, despite an instruction to do so from the administrative law judge. (*Id.*) Huddleston also "instructed the Board members to end their deliberations, in violation of the Tennessee rules of conduct for administrative hearings and in violation of the Chancery Court's remand order." (*Id.* at PageID# 11–12.)

Ingram again appealed to the Chancery Court. (*Id.* at PageID# 12.) The court found that the Board "had acted arbitrarily and/or capriciously" and characterized Huddleston's conduct as "highly irregular and not sanctioned by the rules set out for administrative hearings." (*Id.*) The court also found that Huddleston had "improperly 'interrupt[ed] the Board during its public

deliberations' and that her 'continued participation in deliberations was highly inappropriate.'" (*Id.* (alteration in original).) The court ordered the Board to lift the suspension of Ingram's license or "immediately reconvene" a contested case panel. (*Id.*)

The Board did neither and instead revoked Ingram's license. (*Id.*) Huddleston falsely told Ingram, without explanation, that the Board could not immediately reconvene a contested case panel. (*Id.*) Huddleston also "fraudulently entered into what she represented as 'settlement' discussions" with Ingram, even though she had no authority to do so. (*Id.* at PageID# 13.) In those discussions, she "unilaterally imposed" new obstacles to the reinstatement of Ingram's license and repeatedly made false statements regarding the procedure for rescheduling a contested case hearing. (*Id.*)

Almost six months after the chancery court's second order, Huddleston violated the Board's rules by handpicking the members of a contested case panel for a hearing. (*Id.*) During the hearing, Huddleston did not call any witnesses and failed to present evidence that her proposed order was realistic, which was a condition that the chancery court had imposed. (*Id.*) She also knowingly made false statements to the Board, suborned the perjured testimony of Board staff member Dr. Rene Saunders, and violated many other applicable ethical and procedural rules. (*Id.* at PageID# 14.) Further, Huddleston knew that her proposed order contained false findings of fact and that Ingram would not be able to meet its terms. (*Id.*) Board Member Zanolli also knew that the order contained false findings of fact. (*Id.*) Nonetheless, on December 28, 2016, Zanolli and the rest of the Board "rubber stamped" the proposed order. (*Id.*)

Ingram did manage to eliminate some of the order's inaccuracies. (*Id.*) Ingram highlighted one of the errors to the Board and Zanolli instructed Huddleston to correct it. (*Id.*) However, Huddleston proceeded to alter a "material . . . portion" of the order without notifying the Board or

Ingram. (*Id.*) Ingram noticed the alteration and successfully petitioned the Board to undo the change. (*Id.*) Huddleston made another change that was not immediately noticed—she required Ingram to submit evidence of his compliance with the order to the Board's "medical director," a position that, at the time, did not exist. (*Id.* at PageID# 16.) The Board ultimately entered a corrected final order, which allowed Ingram "to apply to receive the required fellowship training." (*Id.* at PageID# 14.) Within a month of the order, Ingram was accepted into a fellowship program that met the Board's requirements. (*Id.* at PageID# 15–16.)

Ingram attempted to demonstrate compliance with the corrected order. However, Huddleston and Zanolli "entered into an illegal agreement and conspiracy" to prevent Ingram from doing so. (*Id.* at PageID# 15.) Huddleston and Zanolli instructed Ingram to submit documentation of his compliance with the corrected order to Saunders, who had falsely represented that she was the Board's "medical director." (*Id.*) When Saunders would not review Ingram's documentation, he asked Huddleston to clarify who would. (*Id.* at PageID# 15–16.) Even though Huddleston was not the "medical director" of the Board, she responded that she would review Ingram's documents. (*Id.* at PageID# 16.) Ingram independently discovered that Maegan Carr Martin was the person "whose title most closely approximated the nonexistent position of 'medical director' . . ." and submitted his documents to her. (*Id.*) But Martin would not review Ingram's documents either. (*Id.*)

Finally, on July 18, 2017, Ingram was able to demonstrate his compliance with the corrected order. The Board's members, with the exception of Zanolli, voted to ratify Ingram's plan to reenter the practice of medicine. (*Id.*) However, the Board's meeting minutes do not reflect the vote tally due to a change that Huddleston and Zanolli made to Board procedure as part of a conspiracy against Ingram. (*Id.* at PageID# 16–17.) The last act in furtherance of that conspiracy

was the Board's submission to the National Practitioners' Databank—at the request of Huddleston and Zanolli—of a false summary of the Board's action at the July 18, 2017 meeting. (*Id.*) The summary defamed Ingram by stating that the Board had placed limitations on his medical license that were not imposed. (*Id.*)

### B. Procedural History

Ingram filed this action pro se on December 14, 2017, with an application to proceed *in forma pauperis*. (Doc. Nos. 1–2.) His complaint names as defendants the Tennessee Department of Health; the Board; Huddleston; Whittemore; Zanolli; Arnold; Ali; Saunders; Martin; the Consumer Member of the Board (name unknown); and Mutter. (Doc. No. 1, PageID# 1–2.) Ingram sues the individual defendants in their individual and official capacities. (*Id.*) The complaint invokes the Court's federal question jurisdiction and asserts the following claims:

- A 42 U.S.C. § 1983 claim for damages against all defendants for violation of his right to due process;

- A 42 U.S.C. § 1983 claim for damages against all defendants for "[d]eprivation of a property right under color of state law" and without due process (*id.* at PageID# 18);

- A state law fraud claim for damages against Huddleston, Saunders, Zanolli, Arnold, the Board and the Department;

- A state law civil conspiracy claim for damages against all defendants;

- A state law defamation claim for damages against Ali based on his statements to Zanolli during the 2013 hearing, and against the Board, Zanolli, Huddleston and the Department based on the submission of false information to the National Practitioners' Databank;

- A state law negligence claim for damages against the Board and the Department; and

- A request for a declaration that that "Arnold committed perjury at the Board's March 2013 contested case panel and that Defendant Huddleston suborned this perjury" and that "Saunders committed perjury at the Board's December 2016 contested case panel and that Defendant Huddleston suborned this perjury" (*id.* at PageID# 22–23).

Although Ingram's complaint repeatedly requests "any . . . equitable relief to which he is entitled under the constitutions of the United States and the State of Tennessee" (*see, e.g.*, *id.* at PageID# 22) and concludes with a request for "[i]njunctive relief as described above" (*id.* at PageID# 23), the complaint does not ask for any specific injunctive relief.

On February 6, 2018, the Court granted Ingram's application to proceed *in forma pauperis* (Doc. No. 6) and reviewed his complaint under 28 U.S.C. § 1915(e)(1) (Doc. No. 5). The Court dismissed without prejudice Ingram's claims against the Board, the Department, and the individual defendants in their official capacities on sovereign immunity grounds. (Doc. No. 5, PageID# 44–45.) The Court also dismissed all claims against Whittemore, Martin, and the unnamed Consumer Board Member. (*Id.* at PageID# 48, 53.) Finally, the Court dismissed Ingram's fraud claim against Zanolli and his defamation claim against Ali. (*Id.* at PageID# 54.) After the Court's initial review, the following claims remain:

- A 42 U.S.C. § 1983 claim for damages against Huddleston, Zanolli, Arnold, Ali, and Saunders in their individual capacities for depriving Ingram of due process;

- A 42 U.S.C. § 1983 claim for damages against Huddleston, Zanolli, Arnold, Ali, and Saunders in their individual capacities for depriving Ingram of his constitutionally protected property interest in his medical license without due process;

- A state law fraud claim for damages against Arnold based on his false representations that (1) the Board did not allow renewal of suspended licenses and (2) it was impossible to appeal the Board's November 2009 order;

- A state law fraud claim for damages against Saunders stemming from her false statement that she was the Board's medical director;

- A state law fraud claim for damages against Huddleston based on (1) her allegedly false representations, on two different occasions, that it was procedurally impossible for the Board to immediately reconvene a panel for a contested hearing and (2) her fraudulent efforts to settle Ingram's case;

- A state law libel claim for damages against Huddleston and Zanolli based on the submission to the National Practitioners' Databank that falsely described the outcome of the July 2017 Board meeting;

- A state law civil conspiracy claim against Huddleston and Zanolli based on their agreement in early 2017 to impede reinstatement of Ingram's license and against Arnold, Ali, and Saunders, for their acts in furtherance of that agreement; and

- Requests for declaratory relief against Huddleston, Arnold, and Saunders based on the alleged perjury during the March 2013 and December 2016 hearings.

Ali, Arnold, Huddleston, Saunders, and Zanolli have filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) respectively.[2] (Doc. Nos. 17, 18.) Attached as exhibits to the motion are: (1) the Board's Second Corrected Final Order, dated February 17, 2017; Ingram's Petition for Judicial

---

[2] "Without waiving the defense of insufficient service of process," Arnold joins the motion to dismiss. (Doc. No. 17, PageID# 83 n.1.)

Review in the Davidson County Chancery Court, dated February 27, 2017; and (3) a scheduling order in the Chancery Court action. (Doc. Nos. 17-1–17-3.) The defendants argue that the Court should decline to exercise jurisdiction over this action under the doctrine of *Younger* abstention because "the factual allegations in the [Chancery Court p]etition pertain to the same allegations in the present case and relate to the same claims of improper actions by the Board . . . ." (Doc. No. 18, PageID# 112.) Alternatively, they argue that dismissal is warranted under Rule 12(b)(6) because they are entitled to quasi-judicial or prosecutorial immunity and state-officer immunity from Ingram's claims and many of his claims are barred by the statute of limitations. *See Leech v. DeWeese*, 689 F.3d 538, 541 (6th Cir. 2012) (treating judicial immunity as a non-jurisdictional defense under Rule 12(b)(6)). The defendants also ask the Court to decline to exercise supplemental jurisdiction over Ingram's state claims if it finds that Ingram's federal claims should be dismissed.

On July 18, 2018, Ingram filed a response in opposition in which he argues that it would be inappropriate for the Court to abstain from exercising jurisdiction over this action and that neither immunity nor the statute of limitations acts as a bar to his claims. (Doc. No. 22.) To the extent that the Court finds that his claims as pleaded should be dismissed, he asks for leave to amend the complaint. Ingram also filed a request for judicial notice in which he asks the Court to consider the Chancery Court's July 6, 2016 memorandum and final order and "page 989" of the technical record of his Chancery Court case, both of which, he argues, "establish the existence of numerous factual inaccuracies in the pending . . . [m]otion to [d]ismiss . . . ." (Doc. No. 23, PageID# 155.) The defendants filed a reply in support of their motion to dismiss that reasserts their argument that they are entitled to quasi-judicial immunity. (Doc. No. 26.)

On February 28, 2019, the Court ordered the parties to submit supplemental briefs to address its finding that the Chancery Court had entered a memorandum and final order resolving Ingram's petition on September 17, 2018. (Doc. No. 28.) Both Ingram and the defendants responded that the conclusion of the state court proceeding has no effect on their respective positions. (Doc. Nos. 29–30.)

## II.        Legal Standard

### A.        Dismissal Under Rule 12(b)(1)

As "courts of limited jurisdiction[,]" federal courts possess "only that power authorized by Constitution and statute[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a court's constitutional or statutory power to hear the case before it. *See* Fed. R. Civ. P. 12(b)(1); *Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 851 (W.D. Ky. 2007) ("A district court should dismiss a case for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) when that court lacks the statutory or constitutional power to adjudicate a case."). Rule 12(b)(1) motions may present a facial or a factual attack on the court's jurisdiction. A facial attack looks to the allegations of the complaint alone and argues that, even if they are true, the court lacks subject matter jurisdiction. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A factual attack is based on evidence outside the complaint and requires the court to weigh that evidence to determine whether it has jurisdiction. *Id.* In reviewing a factual attack, "a trial court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). The plaintiff bears the burden of proving that jurisdiction exists against either type of challenge. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986); *Mooneyham v. Equifax Info. Servs., LLC*, 99 F. Supp. 3d 720, 722 (W.D. Ky. 2015).

**B. Dismissal Under 12(b)(6)**

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court views the plaintiff's allegations in the light most favorable to him and accepts all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim . . . ." Fed. R. Civ. P. 8(a)(2). However, that statement must allege sufficient facts to show that the claims are "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). To meet it, Ingram must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Id.* (alteration omitted) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Finally, "[a] document filed *pro se* is 'to be liberally construed,' and a '*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Because Ingram is proceeding *in forma pauperis*, the Court has an obligation to sua sponte dismiss any claim that could not survive a motion to dismiss. 28 U.S.C. § 1915(e)(2)(B)(ii).

## III. Analysis

### A. *Younger* Abstention

Because "disposition of a Rule 12(b)(6) motion on the merits is 'moot if [the] court lacks subject matter jurisdiction[,]'" the threshold question is whether, as the defendants argue, the Court

should decline to exercise jurisdiction over this action under the doctrine of *Younger* abstention.[3]

*Hogan v. Nw. Airlines, Inc.*, No. 11-cv-14888, 2013 WL 607852, at *5 (E.D. Mich. Feb. 19, 2013)

(quoting *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir.1990)). The

*Younger* doctrine is an exception to the general rule that federal courts must "decide cases within

the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

Ingram's claims for declaratory relief in this action implicate *Younger* concerns with regard to the

Chancery Court proceedings such that this Court's abstention from deciding those claims is

appropriate.

   In *Younger v. Harris*, the Supreme Court held that, absent "special circumstances," federal

courts must decline to exercise jurisdiction when granting the plaintiff relief would entail enjoining

a pending state criminal prosecution of the plaintiff. 401 U.S. 37, 41 (1971). That holding flowed

from the general principle that courts of equity should refrain from enjoining a criminal

prosecution when the federal plaintiff "'has an adequate remedy at law and will not suffer

irreparabl[e] injury if denied equitable relief.'" *Sprint Commc'ns, Inc.*, 571 U.S. at 77 (quoting

*Younger*, 401 U.S. at 43–44)). Such equitable restraint prevents courts from encroaching on the

role of the jury, avoids duplicative judicial proceedings and sanctions, and demonstrates a "'respect

for state functions'" that is appropriate in our federal system of government. *Id.* (quoting *Younger*,

401 U.S. at 44); *see also Herrera v. City of Palmdale*, --- F.3d ---, 2019 WL 1271152, at *4 (9th

Cir. Mar. 20, 2019) (explaining that the two main sources of the abstention doctrine are "'the

---

[3]      Although the defendants label their *Younger* abstention argument a facial challenge, that argument relies on documents other than Ingram's complaint and is therefore better construed as a factual attack on this Court's jurisdiction. *See Pappas v. Twp. of Galloway*, 565 F. Supp. 2d 581, 586 (D.N.J. 2008) (treating a *Younger* abstention argument as a factual attack).

constraints of equity jurisdiction and the concern for comity in our federal system'" (quoting *Gilbertson v. Albright*, 381 F.3d 965, 970 (9th Cir. 2004))).

Although *Younger* abstention has now extended far beyond its original context, "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter" as a federal action. *Sprint Commc'ns, Inc.*, 571 U.S. at 72. The purpose of the doctrine is to prevent "federal intervention in state judicial processes." *Habich v. City of Dearborn*, 331 F.3d 524, 531 (6th Cir. 2003) (quoting *Moore v. Sims*, 442 U.S. 415, 423 (1979)). The Supreme Court has identified only three "exceptional" categories of state proceedings that trigger *Younger* concerns: (1) state criminal prosecutions; (2) "particular state civil proceedings that are akin to criminal prosecutions[;]" and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc.*, 571 U.S. at 72–73 (citations omitted); *Xcaliber Int'l, Ltd. v. Gerregano*, 290 F. Supp. 3d 747, 752 (M.D. Tenn. 2018). Once the Court has determined that a case falls into one of these three categories, the Court must "analyze the case 'using a three-factor test laid out in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982).'" *Aaron v. O'Connor*, 914 F.3d 1010, 1018 (6th Cir. 2019) (quoting *Doe v. Univ. of Ky.*, 860 F.3d 365, 369 (6th Cir. 2017)). Under that test, abstention is appropriate if: "'(1) state proceedings are currently pending; (2) the proceedings involve an important state interest; and (3) the state proceedings will provide the federal plaintiff with an adequate opportunity to raise his constitutional claims . . . ." *Id.* (quoting *Doe*, 860 F.3d at 369).

Although the defendants fail to specify which triggering category they believe Ingram's state proceedings implicate—and thereby wrongly imply that abstention is appropriate simply because Ingram has a related proceeding in state court—the state actions regarding Ingram's

medical license are most easily identified as state civil proceedings that are akin to a criminal prosecution. *Sprint Commc'ns, Inc.*, 571 U.S. at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). An action of this type is often initiated by a "state actor" to "sanction the federal plaintiff . . . for some wrongful act." *Id.* "Investigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* at 79–80.

Like a state-initiated disciplinary proceeding against an attorney for violating state ethics rules, *see id.* at 79 (citing *Middlesex Cty. Ethics Comm. v. Garden State Bar Assoc'n*, 457 U.S. 423, 433–34 (1982)), the civil enforcement action against Ingram is "'akin to a criminal prosecution' in 'important respects,'" *id.* (quoting *Huffman*, 420 U.S. at 604). According to Ingram's petition, the Division of Health-Related Boards of the Tennessee Department of Health— a "state actor," *id.*—initiated a disciplinary action against him (Doc. No. 17-2, PageID# 96). The proceeding began on April 12, 2006 with "a Notice of Charges and Memorandum for Assessment of Civil Penalties" and culminated in a contested hearing before the Board on September 27, 2006. (*Id.*) The Board suspended Ingram's license on October 19, 2006. (*Id.*) Even though Ingram's petition for judicial review is not itself an enforcement proceeding brought by the State of Tennessee, the Supreme Court has assumed without deciding "that an administrative adjudication and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes." *Sprint Commc'ns, Inc.*, 571 U.S. at 78 (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 369 (1989) (*NOPSI*)).

Having found *Younger* concerns to be triggered by Ingram's state proceedings, the Court must next assess whether those proceedings are currently pending, involve an important state interest, and will provide Ingram an adequate opportunity to raise constitutional claims. *Aaron*, 914 F.3d at 1018. If the state proceeding was pending on the date the federal action was filed, it

will be considered pending until state appellate remedies are exhausted. *See Loch v. Watkins*, 337 F.3d 574, 578–79 (6th Cir. 2003) ("[A]ll of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial." (alteration in original) (quoting *Huffman*, 420 U.S. at 608)). Ingram filed his petition in Chancery Court on February 23, 2017, more than nine months before he filed the complaint in this action. Although the Chancery Court issued a final order dismissing Ingram's petition on September 17, 2018, Ingram has not appealed that order and thus has not exhausted his available state appellate remedies. *See* Tenn. Code Ann. § 4-5-323(a) (explaining that "[a]n aggrieved party may obtain a review of any final judgment of the chancery court under this chapter by appeal to the court of appeals of Tennessee"). The fact of the Chancery Court's order, therefore, did not terminate all *Younger* concerns.

Ingram's petition for judicial review also involves a "vital state interest." *Watts v. Burkhart*, 854 F.2d 839, 846 (6th Cir. 1988). In *Watts v. Burkhart*, the Sixth Circuit addressed a disciplinary proceeding brought by the Board to suspend the plaintiff's medical license. 854 F.2d at 846. In analyzing that proceeding under the second *Middlesex* factor, the *Watts* court emphasized Tennessee's "vital . . . interest in controlling the professional conduct of state-licensed physicians." *Id.* at 847–48. The court noted that Tennessee courts have consistently upheld the constitutionality of statutes regulating medicine and physicians and that the Tennessee Supreme Court has "specifically upheld the state's ability to license physicians and regulate their practice as a valid exercise of the state's police power." *Id.* at 847. The court also noted that its holding was consistent with the Supreme Court's recognition in *Middlesex* that states have an important interest in regulating the conduct of attorneys. *Id.* (citing *Middlesex*, 457 U.S. at 434–35). Because Ingram's

petition sought reinstatement of his license, it implicates Tennessee's important interest in regulating the practice of medicine. Ingram makes no argument to the contrary.

Finally, the state proceedings offered Ingram an adequate opportunity to raise his constitutional claims. Under Tennessee Code Annotated § 4-5-322(h)(1), the Chancery Court can reverse or modify a decision of the Board that is "[i]n violation of constitutional or statutory provisions[.]" Tenn. Code Ann. § 4-5-322(h)(1)). Ingram's petition invoked that statute and asked the Chancery Court to find "that the decisions of the Board at its November 2009, June 2010, March 2013, and December 2016 meetings were made in violation of constitutional or statutory provisions . . . and were unsupported by evidence that is both substantial and material in the light of the entire record . . . ." (Doc. No. 17-2, PageID# 102.) Ingram argues, however, that he did not have an adequate opportunity to raise his constitutional claims in Chancery Court because he cannot "call witnesses, . . . introduce any evidence outside the administrative record compiled in part by [] Huddleston, and does not have the right to a jury trial" in that forum. (Doc. No. 22, PageID# 147.) Ingram also argues that "[n]o current Defendant in this action is even named in the state court appeal." (*Id.*)

Those arguments are unavailing. As the defendants point out, the Sixth Circuit in *Watts* held that judicial review of a decision of the Board under Tennessee Code Ann. § 4-5-322 provides "a full and fair opportunity to litigate . . . constitutional claims . . . ." *Watts*, 854 F.2d at 847–48. Ingram provides no argument or authority to the contrary and thus has not met his burden to "show[] that state procedural law barred presentation of [his] constitutional claims." *Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 701 (6th Cir. 2013).

The three *Middlesex* factors are met here and abstention is appropriate unless an exception "such as bad faith, harassment, or flagrant unconstitutionality" applies. *Am. Family Prepaid Legal*

*Corp. v. Columbus Bar Ass'n*, 498 F.3d 328, 335 (6th Cir. 2007) (quoting *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006)). Ingram does not argue any such exception here. Instead, he states that he does not ask this Court to overturn the Board's or the Chancery Court's decisions, implying that this action is "collateral" to the state proceedings and therefore does not implicate *Younger* concerns. *Am. Family Prepaid Legal Corp.*, 498 F.3d at 336 (quoting *Habich*, 331 F.3d at 531). A federal issue is collateral if its resolution would in no way interfere with the state proceeding, and therefore abstention is inappropriate. *Habich*, 331 F.3d at 532 (quoting *NOPSI*, 491 U.S. at 361); *see Alexander v. Rosen*, 804 F.3d 1203, 1207 (6th Cir. 2015) (finding abstention inappropriate where the plaintiff raised "federal questions that [did] not entangle [the court] in the merits of the state child support proceedings . . . .").

None of the federal issues that Ingram has raised in this action is collateral to those in the state proceedings. To the contrary, Ingram requests a declaration that "Arnold committed perjury at the Board's March 2013 contested case panel;" "Saunders committed perjury at the Board's December 2016 contested case panel;" and that, in each instance, Huddleston suborned the perjury. (Doc. No. 1, PageID# 22–23). Moreover, the extent to which the March 2013 and December 2016 hearings "were based on errors that affected the merits of the Board's decision" is directly at issue in Ingram's petition. (Doc. No. 17-1, PageID# 101.) Finally, Ingram's due process claims in this action overlap with his petition's claim that the Board's actions at the November 2009, June 2010, March 2013, and December 2016 meetings "were made in violation of constitutional . . . provisions[.]" (Doc. No. 17-1, PageID# 101.)

The nature of the *Younger* abstention required depends on the nature of Ingram's claims. "This is because the United States Supreme Court has held that '[u]nder [its] precedents, federal courts have the power to dismiss or remand cases based on abstention principles *only where the*

*relief being sought is equitable or otherwise discretionary.'" Nimer*, 707 F.3d at 702 (emphasis and first alteration in original) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 731 (1996)). Where a plaintiff seeks legal relief in the form of damages, the most a federal court can do is stay those claims until the state proceeding concludes. *See id.*; *Deakins v. Monaghan*, 484 U.S. 193, 202 (1988) ("[T]he District Court has no discretion to dismiss rather than to stay claims for monetary relief that cannot be redressed in the state proceeding.").

Ingram's claims for declaratory relief should be dismissed without prejudice because he did not exhaust his state appellate remedies before seeking relief in this Court. *See Huffman*, 420 U.S. at 608; *NOPSI*, 491 U.S. at 369 ("[A] party may not procure federal intervention by terminating the state judicial process prematurely—forgoing the state appeal to attack the trial court's judgment in federal court."); *Tindall v. Wayne Cty. Friend of Court*, 269 F.3d 533, 540 (6th Cir. 2001) ("Where there exists the possibility of raising and correcting constitutional claims in state courts, the principles of federalism and comity expressed in Younger require that a criminal defendant must first exhaust his state appellate remedies before seeking relief in the District Court." (emphasis omitted) (quoting *Ballard v. Stanton*, 833 F.2d 593, 594 (6th Cir. 1987))); *Hayse v. Wethington*, 110 F.3d 18, 21 (6th Cir. 1997) (explaining that *Huffman* requires a plaintiffs "to 'exhaust' state proceedings that they have already brought . . ."); *Alexander v. Morgan*, 353 F. Supp. 3d 622, 628 (W.D. Ky. 2018) (finding abstention appropriate where the plaintiff received an adverse decision in state court that he did not appeal). Although defendants have requested dismissal of all of Ingram's claims on *Younger* abstention grounds, Ingram's damages claims may only be stayed until the state court proceedings conclude. *See Watts*, 854 F.2d at 849. Because Ingram has no further appellate avenues available to him, the proceedings in state court have

concluded for purposes of this inquiry.[4] The Court will therefore address the defendants' motion to dismiss Ingram's claims for damages under Rule 12(b)(6).

## B. Ingram's Section 1983 Claims

The Court must next determine whether Ingram's remaining federal claims under 42 U.S.C. § 1983 for violations of his procedural and substantive due process rights are viable.[5] For the reasons provided below, they are not.

### 1. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any person of "'life, liberty, or property, without due process of law.'" *Daily Servs., LLC v. Valentino,*

---

[4]     The court in *Major Tours, Inc. v. Colorel*, raised the possibility that, under *Huffman*, a state court proceeding has not concluded for this purpose until the plaintiff exhausts his state appellate remedies. 720 F. Supp. 2d 587, 599 (D.N.J. 2010) (citing *Huffman*, 420 U.S. at 610). When exhaustion is no longer available, however, the courts face the prospect of an "infinite stay." *Id.* at 601. Such a stay is, in effect, a dismissal, and would conflict with precedent that prohibits federal courts from dismissing a damages claim under *Younger* when that claim cannot be raised in the parallel state proceeding. *See id.* at 600; *see also Deakins*, 484 U.S. at 202. A finding that state claims are stayed indefinitely on this reasoning is therefore "untenable." *Major Tours, Inc.*, 720 F. Supp. 2d at 601.

[5]     The Court's screening order referenced the possibility that Ingram had stated a conspiracy claim under 42 U.S.C. § 1985(3). (Doc. No. 5.) Although the defendants do not argue that Ingram has failed to plead the elements of a § 1985 claim, the Court has an independent obligation, under 28 U.S.C. § 1915(e)(2)(B)(ii), to determine whether that is the case. To state a claim under 42 U.S.C. § 1985, Ingram must allege the existence of: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Webb v. United States*, 789 F.3d 647, 671–72 (6th Cir. 2015) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518–19 (6th Cir. 2003)). The Supreme Court has interpreted § 1985's "language requiring intent to deprive of equal protection, or equal privileges and immunities" as requiring that "racial, or . . . otherwise class-based, invidiously discriminatory animus" motivate the conspiracy. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Webb*, 789 F.3d at 672. Ingram does not allege that race or class-based animus drove Huddleston and Zanolli's conspiracy to thwart reinstatement of his license; he has failed to state a § 1985(3) claim against them and any other co-conspirators. *See Brooks v. Carlson*, No. 17-10398, 2017 WL 1091259, at *3 (E.D. Mich. Mar. 23, 2017).

756 F.3d 893, 904 (6th Cir. 2014) (quoting U.S. Const. amend XIV, § 1). A procedural due process claim under 42 U.S.C. § 1983 focuses on the fairness of the procedure used to effect any such deprivation. *Id.* (quoting *EJS Props., LLC v. City of Toledo,* 698 F.3d 845, 855 (6th Cir.2012)). To state a procedural due process claim, Ingram must allege that: "(1) [he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights." *Id.* (citing *Women's Med. Prof'l Corp. v. Baird,* 438 F.3d 595, 611 (6th Cir.2006)).

Ingram has satisfied the first two elements. The Sixth Circuit has held that a medical license is a protected property interest, s*ee Watts*, 854 F.2d at 842 (explaining that "state regulation of occupations through a licensing process gives rise to protected property interests"), and Ingram has alleged that he was deprived of that interest as long as the suspension of his license remained in effect. Whether Ingram has satisfied the third factor depends on the nature of his claim.

The Sixth Circuit has recognized two primary categories of procedural due process claims: "'those involving a direct challenge to an established state procedure' and 'those challenging random and unauthorized acts.'" *Daily Servs., LLC*, 756 F.3d at 907 (citation omitted). In general, an established state procedure is adequate if notice and an opportunity to be heard precede deprivation of a protected property interest. *Id.* at 904. When a random and unauthorized act causes the procedural deprivation, however, "'postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide'; 'no matter how significant the private interest at stake and the risk of its erroneous deprivation, the State cannot be required constitutionally to do the impossible by providing predeprivation process.'" *Id.* at 905 (quoting *Zinermon v. Burch,* 494 U.S. 113, 128–29 (1990)). In such a case, the plaintiff must plead

that available postdeprivation remedies are inadequate to state a procedural due process claim. *See id.* at 910.

Because Ingram has not pleaded anything with respect to the adequacy of Tennessee's remedies for redressing his alleged harm, he fails to state a procedural due process claim against the defendants. *See Gibbs v. Hopkins*, 10 F.3d 373, 378 (1993) (explaining that, "in a § 1983 case 'claiming the deprivation of a property . . . interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate'" (quoting *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir. 1983)). Ingram has not alleged that Tennessee's established procedures governing the Board's conduct failed to afford him notice and an opportunity to be heard; to the contrary, his complaint is rife with references to Board meetings and hearings concerning the status of his medical license.[6] *See Jefferson v. Jefferson Cty. Pub. Sch. Sys.*, 360 F.3d 585, 587 (6th Cir. 2004) (noting that plaintiff conceded that she received adequate predeprivation process where she received notice of the charges against her and had an opportunity to respond both orally and in writing). Instead, Ingram's claim is based on defendants' intentional and repeated violations of the rules governing the Board and administrative hearings.

Ingram therefore must allege that Tennessee's post-deprivation remedies for defendants' conduct are inadequate. *See Jefferson*, 360 F.3d at 588. Not only has Ingram failed to make such allegations, his allegations affirmatively show that he repeatedly sought review of the Board's conduct in Chancery Court under Tennessee Code Annotated section 4-5-322(b)(1)(A), which ultimately led to reinstatement of his license. It therefore appears that Tennessee law afforded him

---

[6] Ingram's only reference to a lack of predeprivation process is his claim that, "[a]t some time subsequent to the Board's June 2010 and March 2013 meetings," the defendants revoked his license "with no notice whatsoever . . ." (Doc. No. 1, PageID# 18). That does not amount to a challenge to Tennessee's established procedure, however, because Ingram alleges that the revocation without notice violated "the rules of the Board . . . ." (*Id.*)

at least one adequate remedy for the conduct at issue in this lawsuit. Without any allegations that this remedy was inadequate, Ingram's claim must fail.

### 2. Substantive Due Process

The substantive component of the Fourteenth Amendment's Due Process Clause establishes that certain state governmental deprivations of "'life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). Substantive due process protects "a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Id.* (quoting *Bell v. Ohio State Univ.,* 351 F.3d 240, 249–50 (6th Cir. 2003)). It also protects against "'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions." *Id.* (quoting *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003). Substantive-due-process claims therefore fall into two categories: "'(1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience.'" *Doe v. Miami Univ.*, 882 F.3d 579, 597–98 (6th Cir. 2018) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)).

Ingram's claim falls in the first category. He alleges that the defendants' "refusal to lift the suspension of [his] medical license and their revocation of [his] medical license . . ." deprived him of a protected property interest. (Doc. No. 1, PageID# 18.) Even if Ingram's medical license falls into the "narrow of class of interests" that substantive due process protects, *compare Gallo v. U.S. Dist. Court For Dist. of Arizona*, 349 F.3d 1169, 1179 (9th Cir. 2003) (concluding that a professional license is an entitlement subject to substantive due process protection), *with Sharma v. Johnston,* No. 10-21560-Civ, 2010 WL 5579885, at *13 n.15 (S.D. Fla. Dec. 13, 2010)

(suggesting that deprivation of a state-defined property right, like a medical license, cannot amount to a substantive due process violation), he has failed to state a substantive due process claim against any of the defendants.

First, there is a serious question as to whether any of the defendants, acting only in their individual capacities, could have caused the harm that Ingram alleges. The Board member defendants—Ali and Zanolli—could only have taken action with respect to Ingram's license in their official capacities as voting members of the Board. Even then, only a full Board vote—not Ali's or Zanolli's votes alone—could deprive Ingram of his property interest in his medical license. It is even harder to imagine how any of the non-Board-member defendants could have caused Ingram's alleged injury, given that they could not vote on the status of his license.

Further, as the defendants argue, the bulk of Ingram's Section 1983 claims are time-barred. The statute of limitations is an affirmative defense, and Ingram does not have to plead that a claim is timely to satisfy Rule 8(a). *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). "For this reason, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* However, when the allegations in a complaint "affirmatively show that [a] claim is time-barred[,]" the claim may be dismissed on the pleadings. *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

State law statutes of limitations for personal injury torts govern Section 1983 claims. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124 (2005); *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, actions for "injuries to the person" must be filed within one year after the cause of action accrues. Tenn. Code Ann. § 28-3-104(a)(1)(A); *Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016). Federal law governs the question of when

the cause of action accrues—i.e., when Tennessee's one-year statute of limitations begins to run. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Howell*, 655 F. App'x at 351. "Because an action generally accrues 'when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred,'" courts must identify the "'event that should have alerted the typical lay person to protect his or her rights.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (quoting *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007)). A substantive due process claim accrues when the deprivation of property is "fully effectuated." *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 521 (6th Cir. 1997).

Ingram's substantive due process claims based on the refusal to lift the suspension of his medical license accrued at the end of the Board's November 2009 meeting. During that meeting, the Board, which then included Ali and Zanolli, ignored warnings from its own counsel that it was violating Ingram's rights and ultimately denied Ingram's application to reinstate his license. The deprivation of Ingram's property interest in reinstatement of his license was "fully effectuated" at that time, at which point Ingram knew of the injury that forms the basis of his claims. *Kuhnle Bros., Inc.*, 103 F.3d at 521. November 2009 is just over eight years before Ingram filed this action and well outside the relevant one-year limitations period. Ingram's substantive due process claims against the Board member defendants are therefore time-barred.

Even if the Court were to assume that Ingram could assert claims against Arnold and Huddleston for their refusal to lift the suspension of his license—which seems nonsensical given their lack of involvement in the November 2009 meeting and their non-Board-member status— those claims would also be time-barred. Arnold's last act relevant to this proceeding was his allegedly perjured testimony during the Board's March 2013 hearing, which is outside the limitations period. Although Huddleston's involvement was more extensive, any claim against her

accrued no later than June 2016, when the Chancery Court issued its order reprimanding the Board and Huddleston for their conduct during the March 2013 hearing.[7] In addition to finding the Board's conduct during that hearing arbitrary and capricious, the court "specifically cited [Huddleston's] unethical behavior as 'highly irregular and not sanctioned by the rules set out for administrative hearings." (Doc. No. 1, PageID# 12.) The court also characterized Huddleston's participation in the Board's deliberations as "highly inappropriate." (*Id.*) June 2016 is also outside the limitations period and therefore any claim against Huddleston is time-barred.

Ingram offers several arguments to support the timeliness of his claims, none of which has merit. First, Ingram invokes Tennessee's discovery rule, which applies to torts and provides that "the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990). Applying that rule, Ingram argues that he was not aware of the nature of the defendants' harm until the December 2016 hearing. Ingram is wrong to argue that Tennessee law is relevant to determine when his Section 1983 claims accrued; federal law governs that inquiry and the operative question here is when the refusal to lift the suspension of his license was fully effectuated. Regardless, Ingram's claim that he was not aware that he had been harmed until December 2016 is unpersuasive; Ingram's complaint affirmatively shows that he knew as early as November 2009 that the Board had denied reinstatement of his medical license in violation of its own rules.

---

[7]     It is not clear from Ingram's complaint exactly when the Chancery Court issued this order. However, Ingram states that, "almost six months" after it issued, Huddleston sought to reconvene the contested case panel. (Doc. No. 1, PageID# 13.) The panel met at some time in December 2016, and therefore the latest the order could have issued is June 2016.

Ingram also invokes Tennessee's single-injury rule and continuing tort doctrine. Ingram argues that "[a]ll damages which can by any possibility arise from a single tort form an indivisible cause of action," (Doc. No. 22, PageID# 153 (citing *Potts*, 796 S.W.2d 678)), and that the damages associated with suspension of his license were ongoing until July 2017, when his license was reinstated (*id.* at PageID# 152–52). Therefore, Ingram concludes that his claims did not accrue until July 2017.

Again, Tennessee law is irrelevant here. However, the federal continuing violation doctrine is a close analog to Ingram's continuing tort argument and the Court will address it in a liberal construction of Ingram's pro se arguments. *See Eidson*, 510 F.3d at 635. The test for establishing a continuing violation has three elements:

> First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern.... Second, injury to the plaintiff must continue to accrue after that event. Finally, further injury to the plaintiff[ ] must have been avoidable if the defendants had at any time ceased their wrongful conduct.

*Id.* (quoting *Tolbert v. State of Ohio Dep't of Transp.,* 172 F.3d 934, 940 (6th Cir.1999)). If those elements are met and the wrongful conduct continues into the statute of limitations period, the claim may be considered timely.

Here, Ingram alleges that Huddleston and Zanolli's conduct continued into the limitations period and that Saunders's conduct began within it. At some point between June and December 28, 2016, Huddleston allegedly entered into unauthorized settlement discussions with Ingram in which she attempted to unilaterally impose new conditions on the reinstatement of his license. Huddleston then arranged for a contested case panel, but handpicked the members in violation of Board rules. During the hearing, Saunders falsely stated that she was the Board's medical director and Huddleston violated numerous procedural rules, ultimately submitting a proposed final order that contained false findings of fact and more than one condition that would be impossible for

Ingram to fulfill. After Ingram petitioned the Board to correct one of those errors in early 2017, Huddleston made another change to the order without notifying the Board. Ingram again successfully petitioned the Board to correct the order. Finally, Huddleston and Zanolli conspired at some point between December 2016 and May 2017 to place further barriers to the reinstatement of Ingram's license: they instructed Ingram to submit documentation of compliance with the December 28, 2016 order to Saunders, who refused to follow the Board's order after receiving that documentation.[8] Huddleston then violated the Board's order by stating that she would review Ingram's documentation. Finally, at the Board's July 18, 2017 meeting, Zanolli voted against reinstatement of Ingram's license and Saunders made undescribed dishonest statements.

"[A] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Eidson*, 510 F.3d at 635 (quoting *Tolbert,* 172 F.3d at 940) (alteration in original). The Court's first question, therefore, is whether Ingram has alleged a continuing due process violation that falls in the limitations period. He has not. In neither the "settlement" negotiations preceding the December hearing, nor in the hearing itself, was there an opportunity for Huddleston, Zanolli, or Saunders to unlawfully refuse to lift the suspension of Ingram's license. As Ingram alleges, only the Board could reinstate his license, which it voted to do on July 18, 2017, despite these defendants' alleged efforts to the contrary. Because Ingram has not alleged that a substantive due process violation occurred within the twelve-month period preceding the filing of his complaint, the continuing violation doctrine cannot make his claims timely.[9]

---

[8] Ingram does not allege what Saunders did to disobey the Board's order.

[9] Ingram does not characterize his substantive due process claim as challenging conscience-shocking actions.

Further, although Ingram claims that his damages continued to accrue until his license was reinstated in July 2017, such damages are continued "ill effects" of the original decision to deny reinstatement of his license; they are not new injures. *Eidson*, 510 F.3d at 635. To the extent that Ingram argues that each unsuccessful effort to reinstate his license between November 2009 and July 2017 amounted to a fresh injury that regenerated the accrual date of his claims, that argument also fails. *See Carter v. Slatery*, No. 3:17-cv-01118, 2018 WL 4254631, at *7 (M.D. Tenn. Sept. 6, 2018) (finding that a plaintiff asserting a due process challenge to the lawfulness of his conviction could not "restart the accrual date for [ ] § 1983 statute of limitations purposes each time he files a new motion or petition in the hope of obtaining a different result"); *Robinson v. Purkey*, 326 F.R.D. 105, 148 (M.D. Tenn. 2018) (concluding a plaintiff could not restart accrual of her procedural due process claims "simply by obtaining a letter from the defendant confirming its position that no . . . hearing is due"). Such a theory of accrual would defeat the purpose of having a statute of limitations. *See Carter*, 2018 WL 4254631, at *7.

Finally, despite Ingram's contrary argument, it would be inappropriate for the Court to equitably toll his time-barred claim. The Sixth Circuit has assumed, without deciding, that equitable tolling applies to § 1983 claims. *See Broom v. Strickland*, 579 F.3d 553, 557 (6th Cir. 2009). In general, equitable tolling is available "when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Zappone v. United States*, 870 F.3d 551, 556 (6th Cir. 2017) (quoting *Jackson v. United States*, 751 F.3d 712, 718 (6th Cir. 2014)). It is Ingram's burden to establish entitlement to equitable tolling and he has not done so here. *See Jackson*, 751 F.3d at 718–19. Ingram claims that equitable tolling must be applied because he feared the Board would retaliate against him if he filed this action at an earlier date. That argument is directly at odds with Ingram's repeated and apparently unconstrained

appeals to the Chancery Court to challenge the Board's actions. Equitable tolling on this basis is not appropriate.

Ingram's claims based on the Board's refusal to lift the suspension of his license are therefore without merit and untimely. That leaves only Ingram's allegation that the Board violated his substantive due process rights when it revoked his license at some point after March 2013. But Ingram's allegation of that harm is too tenuous to state a claim against the defendants who remain in this action. The Court dismissed all claims against the Board based on sovereign immunity. Ingram has alleged only that the Board revoked his license and, in the absence of any specific reference to the actions of the individual defendants, Ingram fails to state a claim against them.

### C. Supplemental Jurisdiction

28 U.S.C. § 1367 provides a district court discretion to decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In exercising that discretion, courts "consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). When all federal claims have been dismissed before trial, these factors usually weigh in favor of dismissing the state law claims. *Id.* (citing *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)).

This case is no exception. The only claims over which this Court has original jurisdiction are Ingram's federal claims, which are now subject to dismissal. That leaves Ingram's state law claims for fraud, libel, and civil conspiracy, which are better pursued in state court. The value of comity weighs especially heavily in this analysis. Ingram's claims all arose within the context of Tennessee's effort to exercise its police power to protect public health by regulating the practice of medicine. Although the Court has an obligation to adjudicate issues of federal law that arise

within that context, a Tennessee court is the more appropriate forum for Ingram's remaining state law claims. *See Thomas v. Tex. State Bd. of Med. Examiners*, 22 F.3d 1093 (5th Cir. 1994) (unpublished table decision) (emphasizing "'the limited role of federal courts in reviewing decisions which are made by an agency of the state exercising its police powers as mandated by the Constitution,"—in that case, the Texas State Board of Medical Examiners) (quoting *Ramirez v. Ahn*, 843 F.2d 864, 869 (5th Cir. 1988)). Further, because this action is still at its earliest stage, the Court has not yet spent significant resources adjudicating it. *Gamel*, 625 F.3d at 952. The relevant factors weigh in favor of declining supplemental jurisdiction over Ingram's state law claims.

Although Ingram requests that the Court retain jurisdiction over his state law claims based on diversity jurisdiction, his complaint is inadequate to establish that the amount in controversy exceeds $75,000.00 and that the parties are diverse. 28 U.S.C. § 1332(a)(1). Ingram states that he is a citizen of California, but he does not plead the citizenship of any of the individual defendants and his complaint does not estimate the damages associated with his state law claims. (Doc. No. 1, PageID# 2–3, 17–23.) He therefore has failed to meet his burden of establishing the elements of diversity jurisdiction. With no other basis for retaining jurisdiction, the state law claims are appropriately dismissed from this Court.

## IV. Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that the defendants' motion to dismiss (Doc. No. 17) be GRANTED. Ingram's claims for declaratory relief and his state law claims should be DISMISSED WITHOUT PREJUDICE for lack of jurisdiction and Ingram's Section 1983 claims should be DISMISSED for failure to state a claim.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 29th day of March, 2019.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge