UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ALTON EARL INGRAM, JR., | |
| Plaintiff, | Case No. 3:17-cv-01565 |
| v. | Judge Eli J. Richardson |
| | Magistrate Judge Alistair E. Newbern |
| TENNESSEE DEPARTMENT OF HEALTH et al., | |
| Defendants. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

This action arises out of the suspension of pro se Plaintiff Dr. Alton Earl Ingram's Tennessee medical license and his subsequent petitions for reinstatement. Ingram filed a complaint against the Tennessee Department of Health (the Department); Tennessee Board of Medical Examiners (the Board); Board general counsel Andrea Huddleston, J.D.; Board attorneys Alexa Whittemore, J.D. and Maegan Carr Martin, J.D.; Board members Dr. Michael Zanolli, M.D., Dr. Subhi Ali, M.D., and Dr. Mitchell Mutter, M.D.; Board Medical Director Dr. Larry Arnold, M.D.; Board Medical Consultant Dr. Rene Saunders, M.D.; and an unnamed Consumer Member of the Board. (Doc. No. 1.) Ingram asserted claims for violations of his right to procedural due process under 42 U.S.C. § 1983; declaratory relief under 28 U.S. § 2201 et seq.; and fraud, civil conspiracy, defamation, and negligence under Tennessee law. (*Id.*) The Court granted Ingram's application to proceed *in forma pauperis* and screened the original complaint under 28 U.S.C. § 1915(e)(2), dismissing all claims against the Department, the Board, Whittemore, Martin, Mutter, and the Consumer Member of the Board. (Doc. No. 6.) The Court also dismissed all of

Ingram's official-capacity claims against the individual defendants, his fraud claim against Zanolli, and his defamation claim against Ali. (*Id.*) The Court dismissed Ingram's remaining claims against Huddleston, Zanolli, Arnold, Ali, and Saunders pursuant to their motion. (Doc. No. 38.) The Court Ingram's § 1983 procedural due process claims with prejudice and his state law claims and claims for declaratory relief without prejudice. (*Id.*) The Court gave Ingram an opportunity to seek leave to amend his complaint to assert diversity jurisdiction over his state law claims. (*Id.*)

Ingram has now filed an amended complaint, asserting various claims against Huddleston, Zanolli, Arnold, Ali, Saunders, Whittemore, Martin, and Mutter in their individual capacities for fraud, negligent misrepresentation, negligence, tortious interference with a contractual agreement, civil conspiracy, and defamation under Tennessee law; retaliation and violations of procedural and substantive due process under 42 U.S.C. § 1983; and declaratory relief under 28 U.S.C. § 2201 et seq. (Doc. No. 47.) The defendants have moved to dismiss Ingram's amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction (Doc. No. 54), and Ingram has responded in opposition (Doc. No. 59).

For the reasons that follow, the Magistrate Judge will recommend that the motion to dismiss be granted in part and that Ingram's procedural due process claims and claims for declaratory relief be dismissed. The Magistrate Judge will further recommend that all remaining claims in the amended complaint be dismissed under 28 U.S.C. § 1915(e)(2) for failure to state a claim on which relief may be granted.

## I.      Background

### A.      Factual Background

Ingram's amended complaint restates the facts pleaded in the original complaint and pleads additional facts for the first time. The factual background from the original complaint is set forth in detail in several of the Court's prior opinions (Doc. Nos. 5, 31, 38) and will not be repeated in

full here. The additional facts pleaded in Ingram's amended complaint are recounted and are presumed to be true for purposes of resolving the present motion to dismiss.

### 1. The Board's 2006 Disciplinary Order

In October 2006, the Board issued a disciplinary order, written by Zanolli, that suspended Ingram's medical license. (Doc. No. 47.) The order permitted Ingram to seek probationary reinstatement of his license after three years by "prov[ing] to the Board that (1) he has obtained additional education or training in anesthesia for surgery and (2) he has maintained proficiency in the medical practice of plastic and reconstructive surgery." (*Id.* at PageID# 536–37, ¶ 4.) Zanolli later stated that he "quite frankly never thought [Ingram] would be back"; called the order "'poorly worded,' 'nebulous,' and 'ill-defined'"; and stated that the order "'parallel[ed],' 'mimicked,' and 'mirrored'" an order issued by a Florida administrative law judge when Ingram's medical license was suspended in that state. (*Id.* at PageID# 536, ¶¶ 2–3 (alterations in original).)

Ingram was concerned that he would not be able to fulfill the order's requirements while complying with Tennessee Board of Medical Examiners Rule 0880-2-.12(d), which states:

> [i]t is the Board's intent that the licensee not practice medicine at all during the period of suspension. If a licensee practices medicine in another state during the period of any ordered suspension, the length of time of practice in another state shall not be counted toward fulfilling the suspension ordered by the Board.

(*Id.* at PageID# 537, ¶ 6 (quoting Tenn. Comp. R. & Regs. 0880-2-.12(d)).) Ingram believed that this rule would prevent him from practicing medicine in any U.S. jurisdiction "and possibly anywhere in the world"—and, thus, from obtaining additional training and maintaining his proficiency in surgery—while his Tennessee license was suspended. (*Id.* at PageID# 537, ¶ 8.) When Ingram raised these concerns to Whittemore, she told him that "[t]he Board would not issue an [o]rder with which compliance was impossible," that the order's lack of specificity regarding how Ingram could "maintain proficiency" in plastic surgery was intended to make it possible for

3

Ingram to comply with the order's requirements, and that Ingram could satisfy the order's conditions without undergoing any additional training. (*Id.* at PageID# 538, ¶¶ 12–14.) Relying on Whittemore's assurances, Ingram did not appeal the 2006 disciplinary order within the statutory period for appeals. (Doc. No. 47.)

When Ingram's suspended license expired in the summer of 2008, he contacted Arnold to discuss renewal and informed Arnold of his plans to satisfy the requirements of the 2006 disciplinary order. (*Id.*) Arnold assured Ingram that the plan Ingram had described would "more than satisfy" the order, making reinstatement of Ingram's license "a sure thing[,]" and told Ingram that there was no procedure by which Ingram could present his plan to the Board for preapproval. (*Id.* at PageID# 539, ¶ 20.) Based on Arnold's assurances, Ingram pursued his plan, submitted documentation to the Board, and received written and verbal confirmation that he had complied with the conditions of the 2006 order. (Doc. No. 47.)

### 2. The Board's November 2009 Meeting

At the Board's November 2009 meeting, Ingram petitioned for reinstatement of his license. The Board denied his petition by a margin of one vote. (*Id.*) Ingram alleges that Zanolli, Ali, and Mutter conspired against him and made statements during the meeting that indicated bias against him. (*Id.*) Ingram states that Zanolli and Ali "defamed" him during the meeting. (*Id.* at PageID# 540–41, ¶¶ 33, 34.) Ali also misstated the definitions of "license suspension," "suspended license," and "probationary license," misrepresented the terms of the 2006 disciplinary order, and instructed Board member Monica Franklin to vote against reinstatement. (*Id.* at PageID# 540–41, ¶ 34.) Mutter, who was then Chairman of the Board, stated that "the Board knows what it wants" and told Ingram that Arnold would be able to advise him about how to achieve reinstatement. (*Id.* at PageID# 541, ¶ 35.) Ingram states that the Board's counsel repeatedly informed Board members

"that they were violating Ingram's rights and were not following the Board's rules." (*Id.* at PageID# 542, ¶ 37.)

After the November 2009 Board meeting, Ingram told Arnold that he wanted to appeal the Board's decision, but Arnold informed him that an appeal would not be procedurally possible. (Doc. No. 47.) In reliance on that statement, Ingram did not attempt to appeal the Board's decision at that time. (*Id.*) For the next six months, Ingram corresponded with Arnold to develop a plan by which Ingram could comply with the Board's requirements for reinstatement. (*Id.*) Arnold told Ingram that he "would take all necessary steps to articulate a workable plan for" lifting Ingram's suspension, but refused to take any steps to create such a plan. (*Id.* at PageID# 542, ¶ 42.)

### 3. The Board's July 2010 Meeting

At the Board's July 2010 meeting, Ingram again sought reinstatement of his license. (Doc. No. 47.) Ingram alleges that Mutter, Zanolli, and Ali made numerous false statements against him in the discussion of his reinstatement. Mutter called Ingram's request that the Board clarify its requirements "an end run." (*Id.* at PageID# 543, ¶ 46.) He also suggested that the Board fully revoke Ingram's Tennessee license or require Ingram to obtain licensure in Florida before his Tennessee license could be reinstated. (Doc. No. 47.) Ingram's attorney asked whether it would be possible to lift Ingram's suspension and impose a probationary period during which Ingram would not be permitted to practice medicine independently. (*Id.*) Mutter responded that such an arrangement would not be possible, even though the Board eventually imposed that condition when it lifted Ingram's suspension in 2017. (*Id.*) By the end of the meeting, the Board still had not indicated how Ingram could receive medical training or otherwise satisfy the order. (*Id.*)

### 4. First Chancery Court Appeal

After the July 2010 meeting, Ingram filed an appeal in the Chancery Court of Davidson County, Tennessee. (*Id.*) In 2012, the Chancery Court found that it lacked jurisdiction over the

appeal due to Ingram's failure to timely appeal the Board's denial of his 2009 petition for reinstatement, but also found convincing evidence that the Board had violated Ingram's constitutional right to due process and several Tennessee statutes. (*Id.*) The Chancery Court remanded the matter to the Board with instructions that,

> [i]f the Board, in keeping with its statutory role in interpreting and construing its own prior order, exercises its discretion to convene a contested case hearing and issue a declaratory order, it shall hold the hearing expeditiously, shall issue a declaratory order that properly construes and applies the terms of its prior 2006 disciplinary order without imposing additional terms and conditions that were not part of that prior order, and shall ensure that a complete record adequate for judicial review is created, including transcriptions of the evidence and proceedings prepared by a certified court reporter.

(*Id.* at PageID# 548, ¶ 65.)

### 5. Second Chancery Court Appeal

Ingram moved for a contested case hearing before the Board, but the Board did not consider Ingram's motion, and Ingram filed another appeal in the Chancery Court. (Doc. No. 47.) After being served with notice of Ingram's appeal, the Tennessee Attorney General's Office contacted Ingram and agreed that, if Ingram dismissed his appeal, the Board would hold a contested case hearing before an administrative law judge (ALJ) at its next scheduled meeting. (*Id.*) The Board delayed the contested case hearing until March 2013, despite the Chancery Court's order that a hearing be scheduled "expeditiously" and the Attorney General's Office's assurance that the hearing would be held at the Board's next scheduled meeting in the summer of 2012. (*Id.*)

### 6. March 2013 Contested Case Hearing

In March 2013, the Board convened a contested case hearing to consider Ingram's petition for reinstatement again. (*Id.*) During the contested case hearing, Huddleston interrupted the panel's deliberations and prevented the panel from considering whether Ingram could demonstrate proficiency in plastic surgery by completing Drexel University's Physician Refresher/Re-Entry

Program. (*Id.*) The ALJ instructed the Board to give Ingram more specific guidance on how to achieve reinstatement, but Zanolli instead stated that the Board had no "'concrete suggestion that would be binding.'" (*Id.* at PageID# 556, ¶ 100.) While the panel was questioning Ingram, Zanolli asked about the accreditation of a fellowship Ingram had completed in Chile, then interrupted Ingram's testimony before he could fully answer. (*Id.*) During a portion of the hearing when Ingram could not correct false statements, Zanolli made numerous false statements to the other panelists, including (1) that Ingram had not performed plastic surgery during his fellowship; (2) that most of his fellowship training was in anesthesia; (3) that the letter of compliance regarding Ingram's fellowship did not indicate that it was affiliated with a university; and (4) that Ingram had applied for license renewal in 2004 without informing the Board that his Florida medical license had been suspended. (*Id.*)

Zanolli attempted to impose a rule that, at future hearings, the Board could only consider evidence from March 21, 2013, or later, which would exclude evidence of Ingram's medical school, residency, and four previous fellowships. (*Id.*) He also attempted to require that Ingram complete a fellowship based in the United States for six months, which Ingram believed would be impossible to do without violating the Tennessee Medical Practice Act and risking a complete revocation of his Tennessee license. (*Id.*) After the March 2013 hearing, Ingram investigated the possibility of becoming licensed to practice medicine in another state but was told that he would be unable to obtain a medical license in any jurisdiction in the United States while his Tennessee license remained suspended. (*Id.*)

Near the end of the contested case hearing, Zanolli asked Huddleston to "'look up' 'the proper [c]onclusions of [l]aw[,]'" then adopted Huddleston's paraphrase of a statute rather than having the Board deliberate over which conclusions of law it wished to adopt. (*Id.* at PageID# 558,

¶ 107.) A motion that Ingram could demonstrate proficiency by attending the Drexel University program was proposed and seconded but, before the panel could vote on the proposal, Zanolli ended the deliberations at Huddleston's instruction. (Doc. No. 47.)

### 7.    Third Chancery Court Appeal

Ingram appealed the March 2013 contested case hearing to the Chancery Court, and, on July 6, 2016, the court found that the Board "had 'acted arbitrarily and/or capriciously'" "by disregarding the administrative law judge's instructions and violating the [Tennessee Uniform Administrative Procedure Act's (TUAPA)] substantive and procedural requirements." (*Id.* at PageID# 559, ¶¶ 112–13.) The Chancery Court also characterized Huddleston's conduct during the hearing as "'highly irregular and not sanctioned by the rules set out for administrative hearings[,]'" and found that "[t]he administrative law judge should not have condoned [Huddleston's] conduct or allowed her comments to be considered by the Board." (*Id.* at PageID# 559–60, ¶ 114.) The court ordered the Board to lift the suspension of Ingram's license or "immediately reconvene and clearly define specific criteria that [Ingram] can realistically follow in order to lift the suspension . . . ." (*Id.* at PageID# 560, ¶ 117 (first alteration in original).)

Despite the Chancery Court's order that the Board "immediately reconvene," Huddleston informed the board at its July 2016 meeting that "no action was required on its part regarding Ingram[,]" and did not notify Ingram that he would be discussed at that meeting. (*Id.* at PageID# 561, ¶¶ 122–23.) Huddleston required that Ingram "communicate with [t]he Board solely through her" and told Ingram that the Board could not immediately reconvene a contested case hearing. (*Id.* at PageID# 560, ¶ 118.) Ingram asked Huddleston whether the Board could hold a contested case hearing immediately before the Board's September 2016 meeting so that Ingram could obtain an order allowing him to practice medicine before the national academic meetings in plastic surgery, which was scheduled for that month and would be Ingram's best opportunity to be

admitted to a plastic surgery fellowship. (Doc. No. 47.) Huddleston told Ingram that a notice provision in Tennessee law would prevent the Board from holding a contested case hearing before or during the Board's September 2016 meeting. (*Id.*) She cited "the same or a similar notice provision" in refusing to schedule a contested case hearing in October or November 2016. (*Id.* at PageID# 563, ¶ 134.)

Huddleston offered to negotiate a settlement with Ingram, "despite the fact that she never had any capacity to negotiate on behalf of [t]he Board." (*Id.* at PageID# 561, ¶ 121.) Huddleston told Ingram that she had discussed the settlement discussions with the Board's medical director, but the Board did not have a medical director between July 2016 and May 2017. (Doc. No. 47.) Ingram believed that Huddleston's references to the Board's "medical director" referred to Saunders, the Board's medical consultant. (*Id.* at PageID# 563, ¶ 139.) Through multiple rounds of negotiations, Huddleston proposed conditions to Ingram; Ingram objected that the conditions were impossible to satisfy, and Huddleston "unilaterally alter[ed]" the conditions after private discussions with Saunders. (*Id.* at PageID# 564, ¶ 140.) While these settlement negotiations were ongoing, Huddleston proposed to the Board that Ingram's required training time be doubled to twelve months, a period of time that she called "an arbitrary number." (*Id.* at PageID# 563, ¶ 136.) Huddleston also imposed a requirement, without review or ratification by the Board, that Ingram submit hundreds of pages of documentation. (Doc. No. 47.)

### 8. December 2016 Contested Case Hearing

In December 2016, Ingram contacted ALJ Steve Darnell and obtained an order convening a contested case hearing that month. (*Id.*) Huddleston then misrepresented the Board members' availability and falsely told Ingram and the ALJ "that she had discussed the hearing with the Attorney General of Tennessee in order to guarantee having 'a quorum' at the contested case panel." (*Id.* at PageID# 564, ¶ 145.) Huddleston delayed sending Ingram the materials that would

9

be before the panelists, which included "over one hundred pages of . . . material that was . . . irrelevant to the panel's sole charge from [the Chancery Court] to 'immediately reconvene' . . . and 'clearly define' a training program acceptable to [t]he Board." (*Id.* at PageID# 564–65. ¶ 147.)

At the December 2016 contested case hearing, Huddleston handpicked the members of the panel and failed to call any witnesses. (Doc. No. 47.) Huddleston also made false statements to the Board and induced false statements by Saunders. (*Id.*) Before the hearing, Huddleston had introduced Saunders to Ingram "as [t]he Board's 'medical director' and as a person who had expertise in the sort of questions" the contested case panel would discuss. (*Id.* at PageID# 565, ¶ 151.) Ingram later learned that Saunders held the title of medical consultant, not medical director. (Doc. No. 47.) At the hearing, Ingram called Saunders as a witness and determined through questioning "that Saunders had no expertise in the matters before the panel[.]" (*Id.* at PageID# 566, ¶ 153.) Saunders exhibited animus towards Ingram during this questioning. (Doc. No. 47.) Huddleston submitted a proposed order to the board with knowledge that it contained false findings of fact and that Ingram would not be able to meet its terms. (*Id.*) Nonetheless, on December 28, 2016, the Board "rubber stamped" the proposed order. (*Id.* at PageID# 566, ¶ 156.)

After Ingram informed the Board that the order contained factual inaccuracies, Zanolli told Huddleston to correct the order. (Doc. No. 47.) Huddleston purported to correct the order in early 2017, but, instead, "changed a material portion of the order . . . ." (*Id.* at PageID# 567, ¶ 158.) Ingram asked Huddleston for a red-lined comparison of the original and revised orders, but she told him that she could not provide one. (Doc. No. 47.) Ingram told the Board that Huddleston had made unauthorized changes to the order, and the Board entered a corrected final order about three months after the December 2016 contested case hearing. (*Id.*) Ingram appealed the Board's 2016 order to the Davidson County Chancery Court. (*Id.*) After speaking with counsel for the Tennessee

Attorney General's office, Ingram agreed to continue the appeal until after he had completed a fellowship program. (*Id.*)

### 9.    Compliance with the Board's 2016 Order

Within a month after the 2016 order was entered, Ingram was accepted into a fellowship program that met the Board's requirements. (*Id.*) Huddleston, Saunders, and Zanolli then agreed to prevent Ingram from demonstrating compliance with the terms of the corrected order. (*Id.* at PageID# 568, ¶ 166.) Saunders continued to present herself as the Board's medical director even though she did not hold that title. (Doc. No. 47.) The 2016 order provided that the Board's medical director would lift the suspension of Ingram's license after receiving written proof that Ingram had been accepted into a twelve-month fellowship program in plastic surgery or any of plastic surgery's subspecialties. (*Id.*) The fellowship was required to be associated with a surgery program accredited by the Accreditation Council for Graduate Medical Education (ACGME). (*Id.*) Ingram was accepted by a fellowship program at Dr. Jeffrey Marvel's Nashville, Tennessee practice. (*Id.*) The fellowship was associated with Baylor College of Medicine's ACGME-accredited surgery program and satisfied all the 2016 order's requirements. (*Id.*) Ingram submitted written documentation of this fellowship training to Huddleston, Saunders, and Martin by April 9, 2017. (*Id.*)

The following day, Huddleston told Ingram that paragraph twelve of the 2016 order required confirmation from Baylor that Ingram's fellowship at the Marvel Clinic was formally associated with Baylor's ACGME-accredited plastic surgery program. (*Id.*) The order had not previously required a "formal association" between Baylor and the Marvel Clinic fellowship. (*Id.* at PageID# 570, ¶ 178.) Ingram obtained a letter from the chairman of the Department of Plastic Surgery at Baylor College of Medicine confirming that the Marvel Clinic Fellowship was associated with Baylor. (Doc. No. 47.) That letter was emailed to Saunders on April 18, 2017. (*Id.*)

The same day, Saunders emailed Ingram to request documentation of "an 'official link between Baylor Department of Surgery and Dr. Marvel's "fellowship" program'" and a written statement from Ingram describing an association between the fellowship and Baylor College of Medicine's Division of Plastic and Cosmetic Surgery. (*Id.* at PageID# 570–71, ¶ 180.) Saunders also informed Ingram that Huddleston was to be included in any discussions of Ingram's license reinstatement. (*Id.*) A week later, Saunders again requested confirmation that Ingram's fellowship was sponsored by Baylor and requested that three of the Board's attorneys be included in any conversations about lifting Ingram's suspension. (Doc. No. 47.) Huddleston falsely told Ingram that it was the Board's practice to receive verification from program directors regarding an individual's participation in a training program and later requested confirmation from Baylor's chairman of plastic surgery "that he was 'acting as Baylor's agent for [the] purposes [of Ingram's Tennessee fellowship].'" (*Id.* at PageID# 571, ¶ 183 (alterations in original).) Baylor's chairman of plastic surgery was not able to provide that confirmation. (Doc. No. 47.) Saunders then told Ingram that she would not review the documentation related to lifting Ingram's suspension, and Huddleston told Ingram to direct communications related to the Board's order to her. (*Id.*) Ingram independently discovered that Martin was "the person whose title most closely approximated the nonexistent position of 'medical director[ ]'" and submitted his documents to her, but Martin also refused to take action to reinstate Ingram's license. (*Id.* at PageID# 572, ¶ 188.)

### 10. The Board's July 2017 Meeting

At the Board's July 18, 2017 meeting, Ingram presented his plan to reenter the medical profession. (Doc. No. 47.) During the meeting, Zanolli falsely stated that Ingram had applied for license renewal ten years earlier without informing the Board that his license had been suspended in Florida. (*Id.*) All members of the Board except Zanolli voted to approve Ingram's proposed training plan, but the Board's meeting minutes do not reflect the Board members' individual votes

12

because of a change that Huddleston and Zanolli made to Board procedure one month earlier. (*Id.*) After the July 2017 meeting, Huddleston, Martin, and Saunders caused the Board to submit an incorrect description of the action taken at the meeting to the National Practitioner Data Bank, stating that the Board had placed limitations on Ingram's medical license that had not been imposed. (*Id.*)

### 11. Reinstatement of Ingram's Medical License

Sometime between December 14, 2017, and May 1, 2018, Huddleston, Saunders, Zanolli, and a representative of the Tennessee Attorney General's Office Ingram believed to be Martin agreed not to cooperate with Ingram's attempts to achieve reinstatement of his medical license. (*Id.*) According to the Board's most recent order, Ingram's suspension would be lifted after May 1, 2018, once Ingram completed his training program and submitted "a statement to the Board stating whether or not, in the estimation of the Program Director, [Ingram] is currently fit to practice medicine and surgery." (*Id.* at PageID# 576, ¶ 203 (alteration in original).) On May 2, 2018, Ingram sent Huddleston, Saunders, and Martin a letter from the director of his fellowship stating that Ingram had "'completed all requirements of his accredited fellowship in cosmetic surgery[.]'" (*Id.* at PageID# 576, ¶ 204.) The letter requested "'that the Board's staff lift all restrictions and/or discipline on Dr. Ingram's medical license.'" (*Id.*) Huddleston, Saunders, and Martin refused to lift the restrictions on Ingram's license. (Doc. No. 47.) Ingram alleges that this refusal was in retaliation for filing the present lawsuit. (*Id.*) At the Board's May 2018 meeting, Ingram petitioned the Board for reinstatement and the Board voted unanimously to lift the suspension. (*Id.*) Ingram's medical license was reinstated in late May or early June 2018. (*Id.*) Although Ingram had planned to begin full time work on May 7, 2018, he had to postpone his start date to July 1, 2018. (*Id.*)

### 12. Final Chancery Court Appeal

The Chancery Court heard Ingram's appeal of the Board's 2016 order in September 2018. (*Id.*) Because Ingram's license had been fully reinstated by that date, the Chancery Court found that Ingram had already received the relief he was seeking and dismissed his petition as "'moot due to changed circumstances.'" (*Id.* at PageID# 578, ¶ 213.) Ingram did not appeal that ruling. (Doc. No. 47.)

### B. Procedural Background

On December 14, 2017, Ingram initiated this action by filing his original complaint, which invoked the Court's federal question jurisdiction. (Doc. No. 1.) Ingram named as defendants the Department, the Board, and Huddleston, Whittemore, Zanolli, Arnold, Ali, Saunders, Martin, Mutter, and the Consumer Member of the Board (name unknown) in their official and individual capacities. (*Id.*) The Court granted Ingram's application to proceed *in forma pauperis* (Doc. No. 6) and screened the original complaint under 28 U.S.C. § 1915(e)(2) (Doc. No. 5). The Court dismissed without prejudice Ingram's claims against the Board, the Department, and his official-capacity claims against the individual defendants on sovereign immunity grounds. (*Id.*) The Court also dismissed all claims against Whittemore, Martin, and the unnamed Consumer Board Member; Ingram's fraud claim against Zanolli; and his defamation claim against Ali for failure to state a claim for which relief may be granted. (*Id.*) However, the Court allowed Ingram's § 1983 claims against Huddleston, Zanolli, Arnold, Ali, and Saunders; fraud claims against Huddleston, Arnold, and Saunders; defamation claims against Huddleston and Zanolli; and requests for declaratory relief against Arnold, Saunders, and Huddleston to proceed. (*Id.*)

Ali, Arnold, Huddleston, Saunders, and Zanolli moved to dismiss the original complaint under Rules 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. (Doc. No. 17.) The undersigned Magistrate Judge submitted a report and recommendation,

14

recommending granting the defendants' motion and dismissing all of Ingram's claims. (Doc. No. 31.) The Court adopted the report and recommendation in part and modified it in part. (Doc. No. 38.) The Court construed Ingram's § 1983 claims as procedural due process claims and dismissed them with prejudice, dismissed Ingram's state law claims and claims for declaratory relief without prejudice, and permitted Ingram to seek leave to amend his complaint to assert diversity jurisdiction over his state law claims. (*Id.*) The Court then granted Ingram's unopposed motion to file an amended complaint. (Doc. No. 46.)

The amended complaint asserts the following claims:

- State law fraud claims for damages against Whittemore, Huddleston, Arnold, Saunders, and Mutter;

- State law negligent misrepresentation claims for damages against Whittemore, Huddleston, Arnold, Saunders, and Mutter;

- State law negligence claims for damages against Arnold, Huddleston, and Saunders;

- State law tortious interference with a contractual agreement claims for damages against Huddleston, Saunders, Zanolli, and Martin;

- State law civil conspiracy claims for damages against Arnold, Mutter, Huddleston, Zanolli, Ali, Saunders, and Martin;

- State law defamation claims for damages against Ali, Zanolli, Mutter, Huddleston, Saunders, and Martin;

- Claims for a declaration under 28 U.S.C. § 2201 et seq. "that Arnold committed perjury at the Board's March 2013 contested case panel, that Saunders committed perjury at the Board's December 2016 [c]ontested [c]ase panel," and that Huddleston[1] suborned this perjury (Doc. No. 47, PageID# 606);

- Claims for damages under 42 U.S.C. § 1983 against Huddleston for retaliating against Ingram for seeking Chancery Court review of the 2013 contested case

---

[1]      The amended complaint seeks a declaration that "Saunders suborned Arnold's and Saunders' perjury." (Doc. No. 47, PageID# 606.) The Court, liberally construing the complaint, assumes that this was a typographical error and that Ingram intended  to refer to Huddleston.

hearing, and against Huddleston, Zanolli, Saunders, and Martin for retaliating against Ingram for filing the present lawsuit;

- Claims for damages under 42 U.S.C. § 1983 against all defendants for violating Ingram's right to procedural due process; and

- Claims for damages under 42 U.S.C. § 1983 against all defendants for violating Ingram's right to substantive due process.

(Doc. No. 47.) Ingram seeks compensatory damages of over five million dollars, calculated as ten years of lost income at five hundred thousand dollars per year. (*Id.*) Ingram also seeks damages for pain and suffering and punitive damages of "no less than ten million dollars." (Doc. No. 47, PageID# 614.) He requests "[w]hatever additional relief the court deems appropriate" and "[i]njunctive relief as described above" but does not ask for any specific injunctive relief. (*Id.*)

The defendants have moved to dismiss Ingram's amended complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Doc. No. 54.) The defendants argue that, because all claims brought under 42 U.S.C. § 1983 in the original complaint were dismissed with prejudice, Ingram is not entitled to assert § 1983 claims in his amended complaint. (Doc. No. 55.) The defendants contend that only Ingram's requests for declaratory relief and state law claims remain pending, and they ask the Court to decline to exercise supplemental jurisdiction over those claims. (*Id.*) The defendants do not challenge whether Ingram has properly invoked the Court's diversity jurisdiction but argue that Ingram can litigate his state law claims in state court because he currently resides and is employed in Nashville, Tennessee. (*Id.*) Ingram has responded that his § 1983 claims for retaliation and deprivation of substantive due process were pleaded for the first time in the amended complaint and thus are not barred by the Court's dismissal of the § 1983 claims asserted in the original complaint. (Doc. No. 59.) Ingram argues that the Court has both federal question and diversity jurisdiction over this action and has submitted an affidavit

stating that he was a citizen of California on the date this action was filed. (Doc. Nos. 59, 60.) The defendants did not file an optional reply.

## II.     Legal Standards

### A.     Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited subject-matter jurisdiction and can adjudicate only those claims authorized by the Constitution or an act of Congress. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 (6th Cir. 2012). Article III of the Constitution extends the federal judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States," and several other categories of cases not at issue here.[2] U.S. Const. art. III, § 2, cl. 1; *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Congress has also granted federal courts diversity jurisdiction over civil actions in which the parties are citizens of different states and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332. Whether the Court has subject-matter jurisdiction is a "threshold" question in any action. *Am. Telecom Co. v. Republic of Leb.*, 501 F.3d 534, 537 (6th Cir. 2007). This reflects the fundamental principle that "'[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

The party asserting subject-matter jurisdiction bears the burden of establishing that it exists. *Id.* at 104. A motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction "may

---

[2]     For example, cases involving ambassadors, public ministers, and consuls and cases between two states or in which the United States is a party. U.S. Const. art. III, § 2, cl. 1.

either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack challenges the sufficiency of the pleading and, like a motion under Rule 12(b)(6), requires the Court to take all factual allegations in the pleading as true. *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 816–17 (6th Cir. 2017) (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). A factual attack challenges the allegations supporting jurisdiction, raising "a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Id.* at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330). District courts reviewing factual attacks have "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

### B.   Screening Under 28 U.S.C. § 1915(e)(2)(B)

Under 28 U.S.C. § 1915(e)(2), the Court is obligated to review the complaint of a plaintiff proceeding *in forma pauperis* and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)–(iii). The standard for reviewing pleadings under § 1915(e)(2) is the same as the standard for evaluating motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead

'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Ingram proceeds pro se, the Court construes his filings "liberally" and holds his amended complaint "to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). There are limits to liberal construction, however, and "courts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

## III.     Analysis

### A.     Previously Dismissed Claims

#### 1.     Declaratory Relief Under 28 U.S.C. § 2201 et seq.

Ingram's amended complaint, like his original complaint, requests a declaration that Arnold and Saunders committed perjury and that Huddleston suborned their perjury. (*See* Doc. No. 1, PageID# 22–23; Doc. No. 47, PageID# 605–06.) Those claims must be dismissed without prejudice for the reasons articulated in the Court's March 29, 2019 report and recommendation

(Doc. No. 31) and September 27, 2019 order and memorandum opinion (Doc. No. 38) and summarized below.

Ingram's claims for declaratory relief implicate *Younger* abstention, which requires that federal courts decline jurisdiction where related state proceedings (1) are currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an adequate opportunity to raise constitutional challenges. *Aaron v. O'Connor*, 914 F.3d 1010, 1018 (6th Cir. 2019); *see also Younger v. Harris*, 401 U.S. 37 (1971). State court proceedings remain pending "until a litigant has exhausted his state appellate remedies." *Loch v. Watkins*, 337 F.3d 574, 578 (6th Cir. 2003) (first citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 (1975); and then citing *Foster v. Kassulke*, 898 F.2d 1144, 1146 (6th Cir. 1990)). As the Court noted in its September 2019 order and memorandum opinion, "[a] party may not procure federal intervention by terminating the state judicial process prematurely—forgoing the state appeal to attack a trial court's judgment in federal court." (Doc. No. 38, PageID# 317 (citing *Alexander v. Morgan*, 353 F. Supp. 3d 622, 628 (W.D. Ky. 2018).)

Ingram's state court petition for review of the Board's proceedings remains pending because he has not exhausted his available state appellate remedies. *See Loch*, 337 F.3d at 578. Those proceedings implicate Tennessee's important state interest in regulating the practice of medicine, *see Watts v. Burkhart*, 854 F.2d 839, 847 (6th Cir. 1988) (hereinafter *Watts I*). The TUAPA afforded Ingram an adequate opportunity to raise his claims that the Board members violated constitutional and statutory provisions. *See* Tenn. Code Ann. § 4-5-322(h)(1) (permitting the Chancery Court to reverse or modify Board decisions that violate constitutional or statutory provisions); *Watts I*, 854 F.2d at 847–48 (holding that judicial review of Board decisions under Tennessee Code Annotated § 4-5-322(h) provides "a full and fair opportunity to litigate . . .

constitutional claims . . .”). Accordingly, *Younger* abstention remains appropriate and Ingram's claims seeking declaratory judgment must be dismissed without prejudice.

### 2. Procedural Due Process

The amended complaint brings procedural due process claims against all defendants. The Court dismissed with prejudice Ingram's procedural due process claims against Huddleston, Zanolli, Arnold, Ali, and Saunders, finding that Ingram "had adequate post-deprivation remedies following the allegedly unconstitutional acts of the Board and its members, specifically the Chancery Court judicial review and the corresponding avenues of appeal" under the TUAPA. (Doc. No. 38, PageID# 324.) In the amended complaint, Ingram repleads his already-dismissed procedural due process claims against Huddleston, Zanolli, Arnold, Ali, and Saunders, and adds new claims against Mutter, Whittemore, and Martin. Ingram argues that he should be permitted to replead these claims because the amended complaint alleges new facts to support his allegations that the defendants violated his procedural due process rights. (Doc. No. 59.) He also argues that the TUAPA offers inadequate postdeprivation protections because it does not provide for discovery, the calling of witnesses, monetary damages, or suits against individual defendants in Chancery Court appeals of agency actions. (*Id.*) Alternatively, he argues that, even if the TUAPA provides an adequate remedy for procedural due process violations, the defendants' refusal to follow the TUAPA's procedures during Board proceedings deprived him of whatever remedy was available. (*Id.*)

These arguments are unavailing. Ingram's amended complaint does not state viable procedural due process claims against any of the defendants. A procedural due process claim may involve either (1) "'a direct challenge to an established state procedure'" that violates the plaintiff's due process rights, or (2) a challenge to "'random and unauthorized acts'" of state officials. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014) (quoting *Mertik v.*

*Blalock*, 983 F.2d 1353, 1365 (6th Cir. 1993)). Where, as here, a plaintiff argues that he was deprived of a property right without procedural due process because of random and unauthorized acts, "'postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide'; 'no matter how significant the private interest at stake and the risk of its erroneous deprivation, the State cannot be required constitutionally to do the impossible by providing predeprivation process.'" *Id.* at 905 (quoting *Zinermon v. Burch*, 494 U.S. 113, 128, 129 (1990)).

Even if the defendants failed to follow TUAPA requirements during the Board's proceedings, the TUAPA's judicial review procedures provide an adequate postdeprivation remedy through Chancery Court review and appeal to the Tennessee Court of Appeals. *See* Tenn. Code Ann. §§ 4-5-322, 4-5-323. As the Court has already found, "the Chancery Court reviews constitutional claims *de novo* and may receive additional proof thereon in cases of alleged irregularities in procedure before the agency not shown in the record." (Doc. No. 38, PageID# 325 (citing Tenn. Code Ann. § 4-5-322(g)); *see also Watts v. Burkhart*, 978 F.2d 269, 276 (6th Cir. 1992) (hereinafter *Watts II*) (en banc) (holding that the TUAPA provides adequate procedural safeguards in medical license revocation proceedings, based in part on the Chancery Court's ability to "go outside the administrative record in considering claims of bias, racial prejudice, and the like"). Nothing Ingram includes in the amended complaint leads to the Court to alter its conclusion that these provisions are adequate. Ingram has not stated a claim for violation of his procedural due process rights and those claims must be dismissed with prejudice.[3]

---

[3]      As discussed below, Ingram's procedural due process claims against all defendants are also barred by quasi-judicial and quasi-prosecutorial immunity.

### B.    New Federal Law Claims

The defendants erroneously argue that the Court has already dismissed all of the § 1983 claims in the amended complaint with prejudice. Ingram's substantive due process and retaliation claims were pleaded for the first time in the amended complaint and have not yet been considered by the Court, which has an obligation to screen them under 28 U.S.C. § 1915(e)(2). Because the defendants are entitled to quasi-judicial and quasi-prosecutorial immunity from Ingram's § 1983 claims, those claims must be dismissed.

### 1.    Quasi-Judicial Immunity

The Sixth Circuit has held that members of the Tennessee Board of Medical Examiners are entitled to absolute immunity from suits for damages under § 1983 in connection with the Board's suspension or revocation of a physician's license. *Watts II*, 978 F.2d at 271. This grant of absolute immunity is available because (1) Board members perform a traditional adjudicatory function akin to that of a judge; (2) revocation proceedings present great "'potential for vexatious lawsuits'"; and (3) "'enough safeguards exist [under the TUAPA] to protect a physician's constitutional rights.'" *Id.* at 278 (quoting *Bettencourt v. Bd. of Registration in Medicine*, 904 F.2d 772, 784 n.15 (1st Cir. 1990)). If the Board has jurisdiction over the proceedings, Board members are "'absolutely immune from liability for [their] judicial acts even if [their] exercise of authority is flawed by the commission of grave procedural errors.'" *Id.* at 277 (quoting *Stump v. Sparkman*, 435 U.S. 349, 359 (1978)); *see also Butz v. Economou*, 438 U.S. 478, 514 (1978) ("[T]he risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women."). "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994); *see also Dhillon v. Tenn. Health Related Bd. of Med.*

*Exam'rs*, No. 3-12-0151, 2013 WL 866945, at *8 n.7 (M.D. Tenn. Mar. 7, 2013) (finding that quasi-judicial immunity extends to non-Board-member employees of the Tennessee Department of Health whose "alleged actions as administrative staff for the Board are . . . integral and intertwined with the administrative hearing process of the Board") *report and recommendation adopted in relevant part by* 2013 WL 1222766 (M.D. Tenn. Mar. 25, 2013).

The Board has statutory jurisdiction "to examine the qualifications of all applicants for certification of fitness to practice medicine or surgery in [Tennessee]" and "to conduct disciplinary hearings[.]" Tenn. Code Ann. § 63-6-101(a)(3) (2021).[4] The Board's regulations provide that individual members of the Board "or a physician designated by the Board" also have authority as consultants to:

> (a) Review and make recommendations on licensure, certification, exemption, renewal, reinstatement and reactivation applications subject to the rules governing those respective applications.
>
> (b) Decide the following:
>
> 1. What, if any, investigation should be instituted upon complaints received by the Division.
> 2. Whether a licensee who is the subject of a complaint received and/or an investigation conducted by the Division is an appropriate candidate pursuant to Board established guidelines for diversion to a professional peer review organization and/or impaired professional association.
> 3. What, if any, disciplinary actions should be instituted upon investigations conducted by the Division.
> 4. What, if any, terms of settlements should be offered in formal disciplinary matters based upon investigations conducted by the Division. A proposed settlement will not become final unless it is subsequently ratified by the Board or a duly constituted panel of the Board.
> 5. Whether and under what terms a complaint, case or disciplinary action might be settled. A proposed settlement will not become final unless it is subsequently ratified by the Board or a duly constituted panel of the Board.

---

[4]     The relevant portions of the cited statutes and regulations do not differ from any previous versions in force during the time period described in the amended complaint.

Tenn. Comp. R. & Regs. 0880-02-.11(4)(a)–(b) (2021). The Board's regulations further provide that a petitioner who has complied with the provisions of a disciplinary order issued by the Board "shall submit a Petition for Order of Compliance . . . to the Board's Administrative Office . . . ." Tenn. Comp. R. & Regs. 0880-02-.12(2)(b)(1) (2021). The Board's consultant and administrative staff are authorized "to make an initial determination on the petition" and either:

> (i) [c]ertify compliance and have the matter scheduled for presentation to the Board as an uncontested matter; or
>
> (ii) [d]eny the petition, after consultation with legal staff, if compliance with all of the provisions of the previous order is not proven and notify the petitioner of what provisions remain to be fulfilled and/or what proof of compliance was either not sufficient or not submitted.

Tenn. Comp. R. & Regs. 0880-02-.12(2)(b)(2)(i)–(ii) (2021).

All the events alleged as the bases of Ingram's claims occurred in the course of the Board's adjudication of Ingram's license suspension and subsequent petitions for reinstatement, which are quasi-judicial proceedings. *See Watts II*, 978 F.2d at 275–77. Ingram's allegations against Board members Zanolli, Ali, and Mutter concern their conduct as Board members who adjudicated Ingram's license suspension and considered his petitions for reinstatement. Zanolli, Ali, and Mutter are thus entitled to absolute quasi-judicial immunity from Ingram's federal claims, which are based on adjudicatory acts within the authority of the Board and its individual members. *See* Tenn. Code Ann. § 63-6-101(a)(3) (2021); Tenn. Comp. R. & Regs. 0880-02-.11(4)(b)(3)–(5) (2021). Although Arnold and Saunders are not alleged to have been members of the Board, Ingram's allegations describe actions that both physicians took under their authority as administrative staff or consultants for the Board—actions that were integral to and intertwined with the Board's administrative hearing process, including reviewing Ingram's plans to comply with the Board's orders and making recommendations to the Board about the terms by which

Ingram's license could be reinstated.[5] *See Bush*, 38 F.3d at 847; Tenn. Comp. R. & Regs. 0880-02-.11(4), 0880-02-.12(2)(b)(2) (2021).

The Board's regulations provide that the Board's legal staff are to be involved in the decision whether to certify or deny a petition of compliance. *See* Tenn. Comp. R. & Regs. 0880-02-.12(2)(b)(2) (2021). Thus, attorneys Huddleston, Whittemore, and Martin are also entitled to absolute immunity for their participation in Ingram's disciplinary case, including communicating with Ingram about the Board's orders and serving as legal advisors to the Board. *See Bettencourt*, 904 F.2d at 785 (holding that medical board's general counsel was entitled to absolute immunity from damages actions for his role in advising the board). Any allegations by Ingram that these defendants acted with improper motive or failed to follow proper procedures are irrelevant to the application of this form of absolute immunity. *See Butz*, 438 U.S. at 514; *Watts II*, 978 F.2d at 277. Accordingly, Ingram's § 1983 retaliation and substantive due process claims against Zanolli, Ali, Mutter, Arnold, Saunders, Whittemore, Huddleston, and Martin must be dismissed with prejudice.

### 2. Quasi-Prosecutorial Immunity

Agency employees also have absolute immunity with respect to functions they perform that are analogous to those of a prosecutor. *Butz*, 438 U.S. at 515; *see also Watts II*, 978 F.2d at 274 ("[T]he case law in this circuit and elsewhere is very clear: public policy requires absolute immunity for officials performing quasi-prosecutorial or quasi-judicial functions, at least where protections such as those provided by the Administrative Procedure Act are in place[.]") Acts undertaken by an official "'in his role as advocate for the State'" are entitled to absolute immunity, including "'actions preliminary to the initiation of a prosecution and actions apart from the

---

[5]     To the extent Ingram asserts claims based on Saunders's testimony at the December 2016 contested case hearing, Saunders is also entitled to quasi-judicial immunity for her actions as a witness. *Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983).

courtroom[.]'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 n.33 (1976)). Agency actions that are quasi-prosecutorial in nature include actions taken during the investigation and institution of disciplinary proceedings, *Quatkemeyer v. Ky. Bd. of Med. Licensure*, No. 11-5994, 2012 WL 5870121, at *3–4 (6th Cir. Nov. 21, 2012), and entering into settlement negotiations with a licensee who has been subject to discipline, *Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999). Like quasi-judicial immunity, quasi-prosecutorial immunity applies even if the official has "rel[ied] upon wrong analyses and false allegations" as the basis for their actions, *Quatkemeyer*, 2012 WL 5870121, at *4, or acted with an improper motive, *Watts II*, 978 F.2d at 274. Actions that are merely investigatory, however, are entitled only to qualified immunity. *Watkins v. Healy*, 986 F.3d 648, 660–64 (6th Cir. 2021).

Ingram's allegations against Huddleston are based on her conduct in prosecuting the disciplinary action before the Board. He alleges that Huddleston violated Board procedures and presented false statements during Board hearings, delayed Board hearings, asked Ingram to submit additional verification in support of his requests for reinstatement, presented proposed orders to the Board that included false statements, and improperly modified the terms of those orders. These allegations involve actions taken by Huddleston while acting as an advocate for the state and include conduct that is prosecutorial in nature, such as decisions about whether, when, and how to bring a disciplinary action before the Board and how to proceed with the disciplinary action after it had been instituted. *See Quatkemeyer*, 2012 WL 5870121, at *3–4. Consequently, quasi-prosecutorial immunity bars Ingram's claims that Huddleston violated his constitutional rights in the course of pursuing the disciplinary charges against him.

The defendants' absolute immunity does not leave Ingram without a remedy, because the Board's disciplinary proceedings are "subject to restraints and safeguards comparable to those

27

built into the archetypal judicial process." *Watts II*, 978 F.2d at 275. Any danger that Board officials may act improperly in the course of disciplinary proceedings is mitigated by the availability of Chancery Court review and further appeal under the TUAPA. *Id.* at 276. Ingram's choice not to pursue the full scope of remedies available under the TUAPA does not negate the protections that the TUAPA provides. The defendants are immune from his claims for monetary damages under § 1983, however, and those claims must be dismissed.

### C. State Law Claims

The defendants argue that the Court should decline to exercise supplemental jurisdiction over Ingram's state law claims, but do not address whether the Court has diversity jurisdiction over those claims. Diversity jurisdiction exists in "all civil actions where the matter in controversy exceeds the sum or value of $750,000 . . . and is between . . . citizens of different states." § 1332(a)(1). Diversity is determined based on the parties' citizenship at the time the litigation was commenced. *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957); *Television Reception Corp. v. Dunbar*, 426 F.2d 174, 177 (6th Cir. 1970). If diversity jurisdiction existed at the time of filing, subsequent changes in a party's citizenship generally will not divest the court of jurisdiction. *Wichita R.R. & Light Co. v. Pub. Utils. Of Kan.*, 260 U.S. 48, 54 (1922); *Television Reception Corp.*, 426 F.2d at 177. The amended complaint states that, at the time this action was filed, Ingram was a citizen of California and all defendants were citizens of Tennessee. Although the defendants have pointed out that Ingram now lives in Tennessee, they have not disputed that he was a citizen of California at the time this action was filed. Ingram also seeks damages of over five million dollars, well over the $75,000 jurisdictional minimum. Accordingly, diversity jurisdiction exists under 28 U.S.C. § 1332(a), and the Court must screen Ingram's state law claims under 28 U.S.C. § 1915(e)(2).

### 1. Negligence and Negligent Misrepresentation

Ingram brings claims for negligent misrepresentation against Whittemore, Huddleston, Arnold, Saunders, and Mutter and claims for negligence against Arnold, Huddleston, and Saunders. The Tennessee Claims Commission Act provides that "[s]tate officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain." Tenn. Code Ann. § 9-8-307(h) (2021). The Tennessee Supreme Court has held "that the legislative purpose and intent of Tenn. Code Ann. § 9-8-307 is to protect state employees from individual liability for acts or omissions that occur in the scope of their employment." *Johnson v. LeBonheur Child.'s Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002).

Ingram alleges that "[e]ach defendant is or was an employee, agent, or designee of the State of Tennessee" and acted within the scope of his or her employment in taking the actions described in the amended complaint. (Doc. No. 47, PageID# 535, ¶¶ 3–4.) As discussed above, Tennessee law grants the Board and its employees the authority to conduct disciplinary hearings and make decisions related to the licensure of physicians. *See* Tenn. Code Ann. § 63-6-101(3) (2021); Tenn. Comp. R. & Regs. 0880-02.11(4), 0880-02-.12(2)(b)(2) (2021). Ingram's claims for negligence and negligent misrepresentation rest on his allegation that, in the course of the disciplinary proceedings against him, the defendants acted negligently—not willfully, maliciously, criminally, or for personal gain. Accordingly, the defendants are immune from Ingram's claims for negligence and negligent misrepresentation and those claims must be dismissed. *See Johnson*, 74 S.W.3d at 342–43 (holding that state-employed physicians were immune from individual-capacity negligence suits for actions within the scope of employment); *Horn-Brichetto v. Smith*, No. 3:17-cv-163, 2019 WL 921454, at *13 (E.D. Tenn. Feb. 25, 2019) (finding that state employees were

immune from individual-capacity claims sounding in negligence); *Camillo v. Campbell Clinic, P.C.*, No. 2:19-cv-02876, 2021 WL 799873, at *4 (W.D. Tenn. Mar. 2, 2021) (same).

### 2.    Defamation

In Tennessee, the tort of defamation encompasses both libel (written defamation) and slander (spoken defamation). *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). Claims for slander must be brought "within six (6) months after the words are uttered." Tenn. Code Ann. § 28-3-103; *see also Quality Auto Parts Co.*, 876 S.W.2d at 822 (holding that six-month statute of limitations for slander begins to run as soon as the words are uttered). Claims for libel are to be brought "within one (1) year after the cause of action accrued[.]" *Id.* at § 28-3-104(a)(1)(A). Unless a libelous statement occurs in a private or confidential communication that is not readily available to the plaintiff or general public, a cause of action for libel accrues on the date of publication. *Ali v. Moore*, 984 S.W.2d 224, 228 (Tenn. Ct. App. 1998).

To state a claim for either form of defamation under Tennessee law, a plaintiff must show "'that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'" *Rose v. Cookeville Reg'l Med. Ctr.*, No. M2007-02368-COA-R3-CV, 2008 WL 2078056, at *4 (Tenn. Ct. App. May 14, 2008) (quoting *Kersey v. Wilson*, No. M2005-02106-COA-R3-CV, 2006 WL 3952899, at *3 (Tenn. Ct. App. Dec. 29, 2006)). "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Quality Auto Parts Co.*, 876 S.W.2d at 820. Ingram must plead and prove such an injury—it may not be presumed. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978).

Ingram brings defamation claims against Ali, Zanolli, and Mutter for statements made during the 2009 and 2010 Board meetings and against Zanolli for statements he made during the

2013 and 2016 contested case hearings. Because this action commenced on December 14, 2017, more than six months after any of those statements were made, Ingram's defamation claims based on those statements are time-barred.

Ingram also brings defamation claims against Zanolli, Mutter, Huddleston, Saunders, and Martin for conspiring to cause an unknown representative of the Board to publish false information to the National Practitioner Data Bank after the Board's July 2017 meeting. The amended complaint does not identify the false statements in the report, but states that the report contained "a false description of the action taken by the Board at [its July 2017] meeting" and "purported to add limitations to Ingram's medical license . . . that do not exist." (Doc. No. 47, PageID# 574, ¶ 195.)

Ingram repeatedly asserts that publication of false information to the National Practitioner Data Bank constitutes "defamation per se." (Doc. No. 47, PageID# 595, 598, 600, 604, 605.) But Tennessee law does not provide a cause of action for defamation per se, and plaintiffs "must plead and prove injury from the alleged defamatory words, whether their defamatory meaning be obvious or not. *Memphis Publ'g Co.*, 569 S.W.2d at 419. Although the amended complaint states that Ingram "was harmed by this dissemination of false information" and suffered economic and noneconomic damages due to a breach of contract for his fellowship, Ingram does not allege that his character or reputation was harmed by the publication at issue. (Doc. No. 47, PageID# 574, ¶ 195.) Accordingly, even when taken as true and construed in the light most favorable to Ingram, the facts alleged in the amended complaint do not state claims for defamation under Tennessee law.

### 3.    Fraud

To state a claim for fraud under Tennessee law, a plaintiff must allege facts showing that (1) the defendant made a representation to the plaintiff of an existing or past fact; (2) that

representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly, without belief in its truth, or recklessly; (5) the plaintiff reasonably relied on the misrepresented fact; and (6) the plaintiff suffered damage as a result of his reliance on the misrepresentation. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). Under both federal and state law, "circumstances constituting fraud must be plead with particularity." *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999) (citing Tenn. R. Civ. P. 9.02); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

Ingram's complaint is replete with allegations that the defendants made false statements about the contents of the Board's orders, the Board's intentions in adopting the orders, what Ingram should do to comply with the orders, and the Board's procedures for considering Ingram's petitions for reinstatement. Specifically, Ingram alleges that:

- Whittemore told him that the Board would not issue an order that was impossible to comply with, that the Board members were knowledgeable about the Tennessee Medical Practice Act, and that the 2006 order was written in such a way that would make it easy for Ingram to comply with its requirement that he maintain proficiency in plastic surgery;

- Huddleston misrepresented the Board's procedures for scheduling hearings and considering Ingram's petitions for reinstatement, told Ingram that she had the authority to engage in settlement discussions, misstated the date on which she had sent hearing materials before the December 2016 contested case hearing, told Ingram that Saunders was the Board's medical director and could assist with lifting his suspension, and misrepresented the reasonableness of the requirements within the Board's 2016 order;

- Arnold told Ingram that he could not appeal the Board's 2009 decision and told Ingram that his plans for reinstatement would be sufficient to satisfy the Board's requirements;

- Saunders made false statements about whether she would be able to reinstate Ingram's license and what documentation Ingram should submit with his petition for reinstatement; and

- Mutter told Ingram that the Board knew what it wanted Ingram to do to obtain reinstatement and advised him to work with Arnold to develop a plan for reinstatement.

(Doc. No. 47.)

Many of these statements can only be construed as the defendants' opinions or statements about future events. "[S]tatements of opinion or intention are not actionable . . . . Similarly, conjecture or representations concerning *future* events are not actionable even though they may later prove to be false." *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1983) (citations omitted) (emphasis added). Whittemore's and Mutter's statements about the Board's intentions and knowledge are, at best, the opinions of the speaker, and any statements about what Ingram should do in the future to obtain reinstatement, what proof he should submit to the Board, and whether individual actors would be able to assist him once he submitted a petition for reinstatement concern future events and therefore cannot form the basis for a fraud claim.

Further, Ingram cannot show that his reliance on the defendants' statements was justifiable. "Justifiable reliance in this context is *not* blind faith." *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005). If "the means of information are at hand and equally accessible to both parties so that, with ordinary prudence or diligence, they might rely on their own judgment, generally they must be presumed to have done so, or, if they have not informed themselves, they must abide by the consequences of their own inattention and carelessness." *Id.* at 409. Ingram alleges that he relied on the defendants' representations about the order's contents, the Board's procedures, the availability of appeals, and individual Board members' roles in the disciplinary process, which delayed the reinstatement of his license and caused him financial harm. Such reliance was not reasonable or justifiable because Ingram had the opportunity to review the order, the Tennessee Medical Practice Act, the TUAPA, and the Board's publicly available rules and regulations.

Ingram could—and should—have determined for himself whether the Board's orders and instructions complied with Tennessee law, what procedures he should follow to petition the Board for reinstatement, and how to appeal the Board's decisions. Therefore, Ingram has not stated a claim for fraud against any of the defendants, and his fraud claims must be dismissed.

### 4. Tortious Interference with a Contractual Agreement

To state a claim for tortious interference with a contractual agreement, Ingram must allege that (1) a legal contract existed; (2) the defendants were aware of the contract; (3) the defendants intended to induce a breach of that contract; (4) the defendants acted with malice; (5) a breach of the contract occurred; (6) the breach was a proximate result of the defendants' conduct; and (7) he was injured by the breach. *Lee v. State Volunteer Mut. Ins. Co.*, No. E2002-03127-COA-R3-CV, 2005 WL 123492, at *10 (Tenn. Ct. App. Jan. 21, 2005) (first citing *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999); then citing *Dynamic Motel Mgmt., Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. Ct. App. 1975)). A complaint for tortious interference must do more than merely state the legal elements of the cause of action; the complaint must state specific facts for each of the seven elements of the tort. *Vanderbilt Univ. v. Scholastic, Inc.*, 382 F. Supp. 3d 734, 759–60 (M.D. Tenn. 2019) (citing *Lee*, 2005 WL 123492, at *10).

After Ingram informed Huddleston and Saunders that he had contracted with Dr. Jeffrey Marvel to participate in a fellowship at the Marvel Clinic, Huddleston, Saunders, Martin, and Zanolli informed him that the fellowship would not satisfy the Board's requirements and did not lift Ingram's license suspension so that he could participate in the fellowship. Ingram alleges that these defendants acted "with specific intent of causing a breach of the business relationship and . . . with improper motive . . . and means" and "caused a breach of Ingram's original contract with Marvel, [which] resulted in Ingram's receiving $54,000 less in salary for the fellowship's duration." (Doc. No. 47, PageID# 590.)

34

Ingram has not pleaded sufficient facts to support a conclusion that Marvel did, in fact, breach his contract with Ingram. The amended complaint does not specify the terms of the contract or the extent to which both parties performed. Without such information, Ingram has not adequately pleaded that contract was breached or that any breach was the proximate result of the defendants' conduct. *See Morris Props., Inc. v. Johnson*, No. M2007-00797-COA-R3-CV, 2008 WL 1891434, at *1 (Tenn. Ct. App. Apr. 29, 2008) (finding that a plaintiff who did not include the terms of a contract in the complaint had not sufficiently alleged that the contract was breached).

The amended complaint also lacks facts to support an inference that the defendants intended to cause a breach of the contract or acted with malice, which is defined in this context as "'the wilful violation of a known right.'" *Whalen v. Bourgeois*, No. E2013-01703-COA-R3-CV, 2014 WL 2949500, at *12 (Tenn. Ct. App. June 27, 2014) (quoting *Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3-CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004)). "Although Federal Rule of Civil Procedure 9(b) permits '[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally[,]' factual allegations corroborating [the] [d]efendant[s'] malicious intent are still necessary" to state a claim for tortious interference under Tennessee law. *Vanderbilt Univ.*, 382 F. Supp. 3d at 760 (first, second, and third alterations in original) (quoting Fed. R. Civ. P. 9(b)). Ingram's allegations that the defendants acted "with specific intent of causing a breach of the business relationship and . . . with improper motive . . . and means" are legal conclusions. (Doc. No. 47, PageID# 590.) Without facts corroborating that the defendants intended to cause a breach of Ingram's contract with Marvel, conclusory allegations of intent cannot support a claim for tortious interference with a contractual agreement. *See Lee*, 2005 WL 123492, at *10.

In support of his tortious interference claim, Ingram alleges that the defendants told him the fellowship would not meet the Board's requirements, requested additional documentation of the fellowship's affiliation with Baylor University, and refused to lift his license suspension so that he could participate in the fellowship. Even construed generously in Ingram's favor, those facts do not support an inference that the defendants intended to interfere with Ingram's contract with Marvel. The Board's rules grant Board staff the discretion to determine whether a petitioner has submitted adequate proof of compliance with the Board's disciplinary orders and whether to schedule the matter for presentation to the Board. Tenn. Comp. R. & Regs. 0880-02.12(2)(b)(2) (2021). Malicious intent cannot be inferred from the fact that the defendants' exercise of that discretion did not result in immediate reinstatement of Ingram's medical license. Because the factual allegations in the amended complaint do not satisfy the third, fourth, fifth, and sixth elements of a claim for tortious interference, those claims must be dismissed.

### 5. Civil Conspiracy

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). A claim for civil conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). If the claim for the underlying predicate tort fails, the conspiracy claim must also fail. *Id.* at 186. Ingram claims that Arnold, Mutter, Huddleston, Zanolli, Ali, Saunders, and Martin conspired to commit tortious acts in order to deprive Ingram of his medical license. Because Ingram has not stated a claim for any of the underlying torts, he has also failed to state a claim for civil conspiracy.

## IV.    Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the defendants' motion to dismiss Ingram's amended complaint (Doc. No. 54) be GRANTED IN PART, Ingram's procedural due process claims under 42 U.S.C. § 1983 be DISMISSED WITH PREJUDICE, and Ingram's claims for declaratory relief under 28 U.S.C. § 2201 et seq. be DISMISSED WITHOUT PREJUDICE.

The Magistrate Judge also RECOMMENDS that, under 28 U.S.C. § 1915(e)(2), Ingram's remaining federal and state law claims against all defendants be DISMISSED WITH PREJUDICE.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 9th day of August, 2021.

ALISTAIR E. NEWBERN
United States Magistrate Judge